T.C. Memo. 2002-246


UNITED STATES TAX COURT


ESTATE OF THEODORE R. THOMPSON, DECEASED, BETSY T. TURNER,
EXECUTRIX, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 7578-99.                Filed September 26, 2002.


    Victor F. Keen and Thomas W. Ostrander, for petitioner.

    Joseph M. Abele, Joellyn R. Cattell, James C. Fee, Jr.,

and David A. Breen, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

    JACOBS, Judge: Respondent determined a $707,054 deficiency in

the Federal estate tax of the Estate of Theodore R. Thompson.

Hereinafter, Theodore R. Thompson is referred to as decedent and

his estate as decedent's estate.

After concessions by decedent's estate, the issue remaining for decision is whether decedent's gross estate includes (1) the value of interests in two family limited partnerships (namely, the Thompson Turner Family Limited Partnership (the Turner Partnership) and the Thompson Family Limited Partnership (the Thompson Partnership)), and in the respective corporate general partners of those partnerships that decedent possessed at death or transferred prior to death (and if so, the value of those interests), or (2) pursuant to section 2036(a), the value of the property which decedent transferred to the family limited partnerships and to the respective corporate general partners of those partnerships (and if so, the value of such property).

All section references are to the Internal Revenue Code as amended and in effect as of the date of decedent's death, and all Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulations of facts and exhibits submitted therewith are incorporated herein by this reference.

I.    Background

Decedent was a resident of the State of Delaware at the time of his death on May 15, 1995. Decedent's estate was administered in Delaware. Betsy Thompson Turner, decedent's daughter and

executrix of his estate, resided in Kennett Square, Pennsylvania, when the petition in this case was filed.

A.   Decedent and His Family

Decedent was born on January 7, 1898, in Kennett Square, Pennsylvania.   In the 1920s, he attended college at Swarthmore College for 2 years.   He left college to help his father start a family rose-growing business, Thompson Roses, in Kennett Square, Pennsylvania.   After his father's death in 1924, decedent operated Thompson Roses with his brother, Howard.

Decedent and his wife, Marian, had two children, Betsy and Robert.   Robert attended Penn State University and subsequently enlisted in the military for 3 years.   Upon discharge from the military, he entered Cornell University, majoring in horticulture. Upon graduation from college, Robert began working at Thompson Roses.

In 1956, decedent gave his one-half interest in Thompson Roses to Robert and to Betsy's husband, George Turner.   Decedent's brother continued to own the remaining half of the business.

Decedent retired from Thompson Roses in 1980.   After decedent retired, he and Marian divided their time between a condominium at Cokesbury Village (a retirement community in Hockessin, Delaware) and a winter home in Naples, Florida.   Decedent's retirement activities included golf, fishing, bridge, and woodworking.

Marian died in 1985, after which decedent moved into an assisted living facility at Cokesbury Village. Decedent resided in this facility until his death in 1995.

Robert retired from Thompson Roses in 1988 and moved to Colorado. George retired in 1991.

Betsy and George[1] had four children--George Clayton, Jr. ("Clay"), William Joel ("Bill"), Phoebe, and Robert--and five grandchildren. Robert had four children[2]--Amy, Margaret, Theodore Robert, and John--and four grandchildren.

B.    Decedent's Finances

By a deed of trust dated January 16, 1969, decedent established a revocable trust with the Meridian Trust Co.[3] (the 1969 trust).

Decedent executed his will in 1979. The will, as subsequently amended by four codicils, provided for, among other things, specific bequests of $100,000 to Betsy and Robert, gifts in varying amounts to his grandchildren, and gifts of $10,000 to each of his great-grandchildren. The residue of decedent's estate went into the 1969 trust. In 1991, decedent executed a durable power of

---

[1]    George died in 1999.

[2]    Robert divorced in 1969 and remarried in 1995. His children are from his first marriage.

[3]    The trustee was originally the National Bank and Trust Co. of Kennett Square, which merged with, and became part of, the American Bank and Trust Co. of Reading, which in turn merged with and became Meridian Trust Co.

attorney appointing Betsy and Robert as his attorneys in fact and granting them power to handle all of his financial affairs.

On March 17, 1993, decedent executed an amendment to the 1969 trust. As a consequence of this amendment, a new revocable trust (the 1993 trust) was created. The 1993 trust was funded with the assets of the 1969 trust. Betsy and Robert were the trustees of the 1993 trust. The assets (worth approximately $1.5 million) transferred to the 1993 trust consisted of securities and cash held in an account at Dean Witter Reynolds, Inc. (Dean Witter).

From 1989 to 1993, Virginia Newnam was the account executive of decedent's trust's holdings at Dean Witter. In 1993, Ms. Newnam changed her employment to Alex Brown, Inc., and the trust portfolio was then transferred to that brokerage firm.

Decedent received the income from the securities held in the 1993 trust. In addition, decedent received annual income of approximately $8,000 from Social Security and approximately $6,000 from annuities with Cigna Insurance Co. and Provident Mutual Life Insurance Co. Decedent had other assets, including shares in a mutual fund, funds in a checking account, and loans receivable owed to him by family members. Decedent's lifestyle was simple, and his expenses were fairly consistent from 1993 to his death in 1995.

Decedent often made substantial gifts of cash, bonds, or insurance policies to his children and grandchildren. From time to time he made loans to his grandchildren, in exchange for promissory

notes. Decedent made the following loans to Robert's children: (1) On December 21, 1978, decedent made a $35,000 mortgage loan to Theodore Robert, at 6-percent interest, payable over 20 years; (2) on September 30, 1987, decedent made a $156,000 mortgage loan to Amy, payable over 20 years; and (3) on June 30, 1989, decedent lent $140,000 to Margaret. Decedent made the following loans to Betsy's children: (1) Decedent lent $15,000 to Phoebe on January 3, 1990; (2) decedent lent $100,000 to William on September 11, 1992; and (3) decedent lent $10,000 to Clay on October 9, 1992, and $15,000 on February 23, 1993.

## II. Formation of the Family Limited Partnerships and Corporations

### A. Introduction to the Fortress Plan

Sometime in 1992 or 1993, Betsy, Robert, and their spouses met with Christian DeVol and William W. Warder. Mr. DeVol was a self-employed financial adviser. Mr. Warder was an insurance salesman and financial adviser with APS Financial Services, Inc. (APS). APS was the licensee for the Fortress Financial Group, Inc., and as a licensee APS was authorized to assist in the implementation of the "Fortress Plan".[4]

---

[4] In Strangi v. Commissioner, 115 T.C. 478, 480 (2000), affd. in part and revd. in part 293 F.3d 279 (5th Cir. 2002), we described the Fortress Plan promoted by Fortress Financial Group, Inc. (Fortress) as follows:

(continued...)

Messrs. Warder and DeVol introduced Betsy and Robert to Charles G. Cheleden, an attorney licensed in the State of Pennsylvania.  Mr. Cheleden reviewed decedent's existing trust documents and will.

In February or March 1993, Messrs. Cheleden and Warder described to Betsy and Robert an estate plan that used family limited partnerships.  In a letter dated March 9, 1993, Mr. Warder recommended using two family limited partnerships, each headed by a corporate general partner, one for Betsy and her family and one for Robert and his family.  In promoting this arrangement, Mr. Warder indicated the primary advantages of the program were  (1) lowering the taxable value of the estate, (2) maximizing the preservation of assets, (3) reducing income taxes by having the corporate general partner provide medical, retirement, and "income splitting" benefits for family members, and (4) facilitating family and charitable giving.  In addition, he stated that "All of the

---

[4](...continued)
Fortress trains and educates professionals on the use of family limited partnerships as a tool to (1) reduce income tax, (2) reduce the reported value of property in an estate, (3) preserve assets, and (4) facilitate charitable giving.  The Fortress Plan recommends contributing assets to a family limited partnership with a corporate general partner being created for control purposes.  The Fortress Plan also suggests that shares of stock of the corporate general partner or an interest in the family limited partnership be donated to a charity.  To facilitate the plan, Fortress licenses the use of copyrighted limited partnership agreements and shareholders' agreements.

benefits above can be achieved while total control of all assets is retained by the directors of the Corporate General Partner." The decision to form the family limited partnerships was made approximately a week later at a meeting at Betsy and George's home attended by decedent, Betsy, George, Robert, and Messrs. Cheleden and Warder.

On March 26, 1993, George P. Brown, president of APS, wrote to decedent, Betsy, and Robert. Mr. Brown outlined the services APS agreed to provide in implementing the Fortress Plan. He further explained that the fee for those services would be $32,000, which fee would be shared with Mr. Cheleden.

A letter of the same date from Mr. Cheleden to decedent, Betsy, and Robert accompanied the March 26, 1993, letter from APS. In his letter, Mr. Cheleden stated that the Fortress Plan was designed to protect assets from third party claims, maximize the amount that passes to heirs, and "allow the Family to maintain control, to the extent possible, consistent with the above." He advised decedent, Betsy, and Robert that the limited partnership interests were "expected to enjoy the benefit of 'discounting' for gifts and estate tax valuation purposes." Mr. Cheleden indicated that a 40-percent discount was a realistic expectation.

Decedent, Robert, Betsy, and George agreed to form two family limited partnerships and two corporations to serve as the corporate general partners--the Turner Partnership and Turner Corp. for

Betsy's family, and the Thompson Partnership and R. P. Thompson Corp. (Thompson Corp.) for Robert's family. The Turner Partnership and Turner Corp. were to be established under the laws of Pennsylvania, where Betsy resided, and the Thompson Partnership and Thompson Corp. were to be established under the laws of Colorado, where Robert lived.

In implementing the Fortress Plan, Mr. Cheleden prepared the partnership and shareholder agreements for the Turner Partnership and Turner Corp., the Pennsylvania entities. Because Mr. Cheleden was not licensed outside of Pennsylvania, he arranged for the partnership and shareholder agreements for the Thompson Partnership and Thompson Corp. to be prepared by Frederick Meyer, an attorney licensed to practice in Colorado.

B.   Formation of the Turner Partnership and Turner Corp.

On April 21, 1993, Turner Corp. and the Turner Partnership were formed under the laws of Pennsylvania. Articles of incorporation for Turner Corp. and a certificate of limited partnership for the Turner Partnership were filed with the Department of State of the Commonwealth of Pennsylvania. The registered office and place of business of both Turner entities was Woodside Farm, Kennett Square, Pennsylvania. Woodside Farm was the residence of Betsy and George.

Stock certificates were issued to decedent (490 shares), Betsy (245 shares), George (245 shares), and National Foundation, Inc.

(20 shares), an unrelated tax-exempt entity.  Decedent, Betsy, and George were the directors and officers of Turner Corp.  Decedent was the chief executive officer, Betsy was secretary, and George was treasurer.

An agreement of limited partnership of the Turner Partnership was executed by all of its partners.  Decedent signed on behalf of Turner Corp.

Decedent, through the 1993 Trust, contributed to the partnership approximately $1,286,000 of his listed securities, plus notes receivable due from Betsy's children.  George contributed to the partnership $1,000 in cash and real property in Vermont valued at $49,000.  At the time of the formation of the Turner Partnership, decedent held a 95.4-percent limited partnership interest, George held a 3.54-percent limited partnership interest, and Turner Corp., as the sole general partner of the Turner Partnership, held the remaining 1.06 percent.[5]

The assets of the Turner Partnership (and the values of those assets) as of July 1993 were as follows:

|  | Shares | Value |
|---|---|---|
| Decedent's contribution |  |  |
| Municipal bonds |  |  |

_____

[5]  Turner Corp. was to pay $15,000 to the partnership for its general partnership interest. However, it did not pay the $15,000 in cash for its interest; rather, the corporation issued a noninterest bearing promissory note in favor of decedent for its 1.06-percent interest.

| | Shares | Value |
|---|---|---|
| Chester Co. | --- | $50,180 |
| Madison Co. | --- | 10,327 |
| PA Higher Ed | --- | 50,472 |
| Puerto Rico | --- | 5,246 |
| Dela. State | --- | 52,131 |
| Stocks | | |
| Atlantic Richfield | 100 | 11,575 |
| Coca Cola | 2,400 | 103,800 |
| GTE | 11,200 | 404,600 |
| General Electric | 1,600 | 157,600 |
| Intercap Qual Muni Inv. | 2,000 | 32,000 |
| Intercap Qual Muni Inc. | 1,200 | 18,150 |
| IBM | 426 | 18,957 |
| Johnson & Johnson | 600 | 21,900 |
| Merck | 900 | 27,563 |
| Meridian Bankcorp | 1,000 | 32,125 |
| 3M | 200 | 21,000 |
| Phila. Elec./PECO Energy | 500 | 15,750 |
| Petrolite | 3,000 | 105,000 |
| Xerox | 1,800 | 131,400 |
| Mutual funds | | |
| John Hancock | 900 | 15,894 |
| Loans receivable | | |
| Phoebe Turner | --- | 15,000 |
| William Turner | --- | 100,000 |
| George Turner, Jr. | --- | 10,000 |
| Decedent's total | | 1,410,670 |
| | | |
| Betsy/Georges's contribution | | |
| | | |
| Cash (checking account) | --- | 1,000 |
| Real Property | | |
| Vermont property | --- | 49,000 |
| Betsy/George's total | | 50,000 |
| Total assets | | 1,460,670 |

In 1994, after George contributed the Vermont property to the Turner Partnership, Mr. Cheleden advised him that the initial capitalization of the partnership might present certain investment company issues pursuant to section 721(b) which could affect the intended nonrecognition treatment of capital contributions to the partnership. Accordingly, Mr. Cheleden recommended that the Turner

Partnership limited partnership agreement be amended to allocate the gains, losses, and distributions from the Vermont property to George.

By an undated amendment to the limited partnership agreement, retroactive to April 23, 1993, the partners allocated all gains and losses from, and distribution of real estate contributed to, the partnership to the contributing partner. The amendment was intended to apply only to certain real property held in Vermont by George. In accordance with the amendment, George was entitled to keep all net proceeds from the timber sales generated from the Vermont property owned by the partnership.

C.    The Thompson Partnership and Thompson Corp.

Thompson Corp. was duly formed and organized as a Colorado corporation on April 21, 1993. The Thompson Partnership was duly formed and organized as a Colorado limited partnership on April 30, 1993. Robert was the registered agent. His ranch in Norwood, Colorado, was the registered office and place of business for both the Thompson Partnership and Thompson Corp. Thompson Corp. was the corporate general partner of the Thompson Partnership. Decedent and Robert each held 49 percent (490 shares) of the stock of Thompson Corp. Robert H. Thompson (an unrelated third party) held the remaining 2 percent (20 shares). Robert was the president, Robert H. Thompson was the vice-president, and decedent was the secretary/treasurer. Upon formation of the Thompson Partnership,

decedent contributed approximately $1,118,500 of his listed securities, along with notes receivable from Robert's family members, to the partnership. Robert contributed to the partnership his interest in 10 T. Rowe Price mutual funds worth approximately $372,000, and his Norwood ranch in Colorado (appraised at $460,000).

The assets of the Thompson Partnership (and the values of those assets) as of July 1993 were as follows:

|  | Shares | Value |
|---|---|---|
| Decedent's contributions |  |  |
| Municipal bonds |  |  |
| Dist. Columbia | --- | $53,685 |
| Dover Dela. Wtr & Swr | --- | 27,498 |
| Dover Dela. Wtr & Swr | --- | 22,019 |
| Orlando Waste | --- | 5,208 |
| Dela. Hlth | --- | 33,548 |
| Tampa Wtr & Swr | --- | 43,713 |
| Stocks |  |  |
| Atlantic Richfield | 100 | 11,575 |
| Coca Cola | 2,400 | 103,800 |
| GTE | 9,200 | 332,350 |
| General Electric | 1,600 | 157,600 |
| Intercapital invest | 2,000 | 32,000 |
| Intercapital income | 800 | 12,100 |
| IBM | 400 | 17,800 |
| Johnson & Johnson | 600 | 21,900 |
| Merck | 900 | 27,563 |
| Meridian Bankcorp | 1,000 | 32,125 |
| 3M | 200 | 21,000 |
| Phila. Elec./PECO Energy | 500 | 15,750 |
| Xerox | 1,800 | 131,400 |
| Mutual Funds |  |  |
| John Hancock Freedom | 900 | 15,894 |
| Loans receivable |  |  |
| Amy Thompson | --- | 139,739 |
| Ted Thompson | --- | 14,064 |
| Margaret Thompson | --- | 140,000 |
| Decedent's total |  | 1,412,331 |

Robert's contributions

| | Shares | Value |
|---|---|---|
| Mutual Funds | | |
| Equity income | --- | $64,811 |
| European stock | --- | 10,673 |
| Intl stock | --- | 32,710 |
| Japan fund | --- | 35,268 |
| New American growth | --- | 37,660 |
| New Asia | --- | 22,449 |
| Science & Technology | --- | 58,236 |
| High yield | --- | 5,597 |
| Intl bond | --- | 103,905 |
| Prime Reserve-cash | --- | 1,499 |
| Ranch in Norwood, CO | --- | 460,000 |
| Robert's total | | 832,808 |
| Total assets | | 2,245,138 |

At the time of the formation of the partnership, decedent held a 62.27-percent limited partnership interest and Robert held a 36.72-percent limited partnership interest. The Thompson Corp., as the general partner of the Thompson Partnership, held the remaining 1.01-percent interest.

## III. Operation of the Partnerships

### A. Decedent's Financial Affairs Through the Turner Partnership and the Thompson Partnership

Before forming the partnerships and corporations, Betsy, Robert, and decedent had agreed that decedent would be taken care of financially. They also wanted to make sure that decedent could access money in the partnerships in order to continue making gifts to his children, grandchildren, and great-grandchildren. In a letter dated April 4, 1993, to Mr. Warder, Betsy asked how decedent's access to his checking account with his broker would be affected by the family partnerships. She specifically asked

whether her father would be able to draw money from the Dean Witter account in order to give $10,000 gifts to children, grandchildren, and great-grandchildren each year.

In a letter dated November 28, 1993, George wrote to Mr. DeVol asking: "How does Betsy's father get $40,000 to give away as Christmas presents (with checks dated January 1994)? (Bob Thompson has a similar question.)."

In 1993 both the Turner Partnership and Thompson Partnership made distributions of $40,000 to decedent in order that he could continue his practice of giving gifts at Christmastime to family members. The $40,000 distributions from the partnerships were shown on decedent's Schedule K-1, Beneficiary's Share of Income, Deductions, Credits, etc., as a distribution/withdrawal for that year and as a reduction in his capital account.

On January 11, 1995, the Thompson Partnership made a distribution of $45,500 to decedent's checking account, in order that decedent's Christmas checks to Robert, his children, and his grandchildren would not bounce. On the same date, the Turner Partnership made a distribution of $45,220 to decedent's checking account, in order that decedent's Christmas checks to Betsy, her children, and her grandchildren would not bounce.

In 1994 and/or 1995, in addition to some cash gifts, decedent made gifts of interests in the Turner Partnership and the Thompson Partnership. Gift tax returns filed by decedent (or on his behalf)

reported adjusted taxable gifts of $9,324 for gifts of the Turner Partnership interests and $10,000 for gifts of the Thompson Partnership interests.

The partnerships distributed funds to decedent to pay for his personal expenses. In a January 19, 1995, handwritten letter to Robert, Betsy wrote:

> Here is a list of Dad's 1994 expenses (The Keely Mgt. fee will not be repeated.) The miscellaneous will not be quite as high as he no longer buys lumber. But as you can see he will need an infusion.
>
> He still has, in his Alex Brown Acct. as of today $31,806, $5,000 of this in cash.
>
> C.G. Cheleden suggested we transfer securities into his personal Alex Brown Acct # 05312, rather than each partnership selling something & transferring cash. I just looked at our partnership statement. We could transfer a Penna. Higher Ed. Facility (50,000 shares worth $50,864, ½ of it worth $25,432) & Dad could sell these off as he needed them. Do you think $25,000 from each of us [is] the right amount?
>
> Let me know what you think. He's okay for now, as there is enough cash in the account for February.

Attached to the letter was a schedule of decedent's expenses in 1994 totaling $57,202.40. This amount included Delaware State tax of $7,347, Federal income tax of $23,623, and Cokesbury assisted living center expenses of $20,072.20. The $57,202.40 total did not include $3,000 which Betsy identified as a "Keely Mgt. (fee for discounting partnerships)".

The Thompson Partnership distributed $12,500 to decedent in March 1995.

B.  Operation of the Turner Partnership

1.  Securities

The investment strategies for decedent's trust holdings did not change significantly after they were transferred to the Turner Partnership.  Ms. Newnam remained as adviser, and decedent's securities continued to be held in the Alex Brown account.  The amount of activity of the Turner Partnership account was low; indeed, at trial, Ms. Newnam could not characterize the trading activity of the account as even "moderately" traded.

2.  Life Insurance Policies

The Turner Partnership owned insurance policies on the lives of George and Betsy.  The amount of insurance on George's life was $237,500 with a term rider of $196,500, for which the partnership paid an annual premium of $15,992.88.[6]  The amount on Betsy's life was $200,000, for which the partnership paid an annual premium of $3,927.

3.  Lewisville Properties

In September 1993, Betsy, George, and their daughter, Phoebe, discussed investing in a real estate project, known as the Lewisville Properties.  Lewisville Properties was a modular home construction venture.  Phoebe, a real estate broker, believed that little risk was involved in making the investment and that she

---

[6]    The proceeds of the life insurance policy were paid to the Turner Partnership after George's death in 1999.

expected the investment could generate a profit of approximately $30,000. On September 22, 1993, Phoebe brokered an agreement of sale between the sellers and "George Turner & Betsy Turner, or their assignee". In October 1993, George opened a checking account in the name of "TTLP t/a Lewisville Properties" at First National Bank of West Chester. The account was opened with a check from the Turner Partnership in the amount of $20,000. George advised the bank that Phoebe, Betsy, himself, and William Robinson (a C.P.A.), would have signatory authority for the account.

On October 15, 1993, Lewisville Properties was purchased by the Turner Partnership for approximately $44,000. The partnership financed the purchase and construction costs of Lewisville Properties through a margin loan made on the brokerage account of the Turner Partnership. The total investment in the property was approximately $186,000.[7]

4.   Woodlands Property

Woodside Farm was the private residence of Betsy and George; it was listed as the principal place of business for both the Turner Partnership and Turner Corp. Adjacent to Woodside Farm were 22 acres known as Woodlands Property. The property contained a swimming pool and small pool house, trails, a pond, and a dam. On

---

[7]   In Nov. 1995, Lewisville Properties was sold for a net loss to the Turner Partnership of approximately $60,000. Phoebe received a commission of $9,120. She applied this amount toward a $15,000 loan borrowed from decedent.

December 22, 1994, Betsy and George contributed Woodlands Property to the Turner Partnership. Before contributing Woodlands Property to the partnership, the Turners placed on the property a conservation easement that prohibited the cutting or removal of trees from the property.[8]

### 5. Woodside Properties Partnership Interest

Betsy and George each held a 35-percent partnership interest in a real estate partnership known as Woodside Properties. Phoebe held the remaining 30-percent partnership interest. Woodside Properties consisted of six residential apartment units in two buildings located in West Chester, Pennsylvania. Woodside Properties' real estate was titled in the names of Phoebe and Betsy. Phoebe was the managing partner and listing agent for Woodside Properties.

In December 1994, Betsy and George each assigned their interests in Woodside Properties to the Turner Partnership. After the assignment, Woodside Properties' real estate remained titled in the names of Phoebe and Betsy.

---

[8] In 1997, Betsy and George listed Woodside Farm for sale and included the 22-acre Woodlands Property. Woodside Farm and Woodlands Property were sold to a single purchaser for a gross sales price of $550,000. After reduction for settlement charges ($43,586) and the first mortgage loan ($198,274), Betsy and George received net proceeds of $312,351. Upon the sale of the property, Betsy and George allocated to the Turner Partnership $12,351 of the Woodside Farm/Woodlands Property sales proceeds, which amount equaled the partnership's adjusted basis in the Woodlands Property.

### 6. Loans/Notes

The Turner Partnership was used to continue decedent's practice of lending money to Betsy's children and grandchildren. In April 1994, the Turner Partnership lent $35,000 to Betsy's son Robert and his wife. In October 1994, the principal of the loan was increased to $45,000 and subsequently increased to $50,000. In October 1994, the Turner Partnership lent $15,000 to Betsy's son Bill; it lent an additional $8,000 to Bill in May 1995. The Turner Partnership maintained records of the amounts that were owed and paid on the loans.

Each partnership determined the current rate of interest to be charged on the loans. Although monthly interest payments were provided as a term on the loans held by the partnerships, those interest payments were often either late or not paid at all. The principal of such loans was payable on demand. When a principal payment was made, often the loan was reamortized and subsequent interest payments reduced. No enforcement action was taken against any family member/borrower when payment on the loans was not made. No loans were made to anyone outside the Turner/Thompson family.

### C. Operation of the Thompson Partnership

Robert lived on the 312-acre Norwood Ranch in Colorado both before and after it was contributed to the partnership. After he contributed the ranch to the partnership, he entered into a lease

with the partnership. Under the terms of the lease, Robert was required to pay rent of $12,000 per year.

Before contributing the ranch to the partnership, Robert did not treat the ranch as a business. He maintained the ranch in the same manner both before and after its transfer. Robert raised and trained mules on the ranch. Any income from the sale of the mules went to Robert individually, not to the partnership. On the Thompson Partnership tax returns for the years 1993 through 1996, however, the partnership claimed losses from the operation of the ranch.

On several occasions, the partnership paid the rent it received from Robert to Thompson Corp. as a management fee. For the years 1993, 1994, and 1995, management fees were paid by the Thompson Partnership to Thompson Corp. in the amounts of $23,625, $45,000, and $47,500, respectively.[9]

Robert was paid an annual salary of $32,001 as president of Thompson Corp. Robert's wife, Karen, was paid a salary of $350 a month for assisting with recordkeeping. She used the money to fund her retirement account.

Thompson Corp. carried workman's compensation insurance on Robert and Karen that covered any injury or accident they suffered in their home. In addition, the corporation paid the following

---

[9] For the years 1996 and 1997, management fees were paid by the Thompson Partnership to Thompson Corp. in the amounts of $52,800 and $48,000, respectively.

personal expenses: Robert's American Association of Retired Persons (AARP) supplemental insurance of $63 month, Karen's health insurance of $987 per quarter, and a subscription to the Wall Street Journal. In addition, the corporation paid Robert $200 a month for use of his truck in maintaining the ranch.

IV. Decedent's Estate

A. Transactions With the Partnerships

Decedent died on May 15, 1995, at the age of 97. Upon decedent's death, the 1993 trust was to terminate and the entire trust balance was to be paid and distributed to decedent's then-living lineal descendants, per stirpes. The trustees were empowered to transfer money from the trust to decedent's estate to permit the funding of any monetary bequests made in decedent's will and the payment of any expenses.

At the time of his death, decedent held a majority interest in the Turner and Thompson Partnerships, as well as stock in their corporate general partners. He also held an interest in a brokerage account of approximately $56,000, an interest in a mutual fund of approximately $25,000, a checking account of approximately $8,000, and a promissory note in the amount of $9,300.

The assets of the Turner Partnership (and the values of those assets) as of decedent's date of death were as follows:

| Assets | Value |
|---|---|
| First National Bank | |
| General | $3,404 |
| Lewisville | 1,479 |

| Assets | | Value |
|---|---|---|
|   Total | | $4,883 |
| Marketable securities | | |
|  Municipal bonds | | |
|   Chester Co | 15,118 | |
|   Madison Co | 12,000 | |
|   PA Higher Ed | 5,020 | |
|   Puerto Rico | 5,016 | |
| Stocks | | |
|   Atlantic Richfield | 11,475 | |
|   Coca Cola | 138,900 | |
|   GTE | 383,600 | |
|   General Electric | 184,400 | |
|   Intercap Qual Muni | 42,775 | |
|   IBM | 40,470 | |
|   Johnson & Johnson | 38,175 | |
|   Merck | 38,025 | |
|   Meridian Bankcorp | 33,625 | |
|   3M | 24,550 | |
|   PECO Energy | 13,375 | |
|   Petrolite | 93,000 | |
|   Xerox | 217,575 | |
|  Mutual funds--John Hancock | 19,710 | |
|  Margin loan | (208,056) | |
|   Total | | 1,108,753 |
| Real Property | | |
|   Vermont property | 49,000 | |
|   Lewisville property | 154,500 | |
|   Woodlands | 110,000 | |
|   Woodside Properties[1] | 102,416 | |
|   Total | | 415,916 |
| Loans receivable | | |
|   Phoebe Turner | 14,961 | |
|   William Turner | 98,519 | |
|   George Turner, Jr. | 9,843 | |
|   William Turner, IV | 13,171 | |
|   Robert & Lorraine Turner | 48,275 | |
|   Bill's Bloom, Inc. | 8,000 | |
|   Total | | 192,769 |
| Accrued Int. & Div. | | 3,032 |
| Cash value life insurance | | |
|   George | | 8,907 |
|   Betsy | | 1,821 |
| Unearned premium | | 15,905 |
|   Total[2] | | 1,751,986 |

[1]    Decedent's estate valued Woodside Properties at $15,786.

[2] The estate's total value ascribed to the assets was $1,655,356.

The assets of the Thompson Partnership (and the value of those assets) as of decedent's date of death were as follows:

| Assets | | Value |
|---|---|---|
| Cash | | $57,096 |
| Marketable securities | | |
|  Municipal bonds | | |
|   Dist. Columbia | 50,141 | |
|   Dover Dela. Wtr. & Swr | 20,813 | |
|   Dela. Hlth | 26,880 | |
|   Intercapital invest | 36,975 | |
|   Intercapital income | 13,375 | |
|  Stocks | | |
|   Atlantic Richfield | 11,475 | |
|   Barrick Gold | 16,363 | |
|   Coca Cola | 138,900 | |
|   Fluor Corp. | 15,188 | |
|   GTE | 315,100 | |
|   General Electric | 184,400 | |
|   Glaxo Wellcome PLC | 20,813 | |
|   IBM | 38,000 | |
|   Johnson & Johnson | 38,175 | |
|   Merck | 38,025 | |
|   Meridian Bankcorp | 33,625 | |
|   3M | 24,550 | |
|   PECO Energy | 13,375 | |
|   Xerox | 217,575 | |
| Mutual Funds | | |
|  John Hancock Freedom | 19,710 | |
|  Equity income | 61,486 | |
|  Intl Stock | 40,348 | |
|  Latin America | 18,444 | |
|  Mid-cap growth | 45,953 | |
|  New Asia | 12,495 | |
|  Science & Technology | 68,912 | |
|  Intl bond | 128,903 | |
|  U.S. Treasury | 43,926 | |
|  Total[1] | | 1,693,925 |
| Loans receivable | | |
|  Amy Thompson | 103,451 | |
|  Ted Thompson | 9,348 | |
|  Margaret Thompson | 116,852 | |
|  Total | | 229,651 |

| Assets | Value |
|---|---|
| Accrued interest & dividends | $4,066 |
| Ranch in Norwood, CO | 595,000 |
| Total[2] | 2,579,738 |

[1] Decedent's estate valued marketable securities at $1,693,922.

[2] Decedent's estate's total value ascribed to the assets was $2,579,734.

On May 27, 1995, the Turner Partnership sold over $347,000 of securities it held through the Alex Brown account.  Around the same time, the Thompson Partnership sold more than $350,000 in securities.   On October 8, 1995, distributions were made from the 1993 trust, in partial satisfaction of specific bequests in decedent's will, as follows:

Betsy's children:

| | |
|---|---|
| George Turner Jr. | $15,000 |
| Phoebe Turner | 4,000 |
| Robert J. Turner | 20,000 |

Robert's children:

| | |
|---|---|
| Amy Thompson | $20,000 |
| Margaret Thompson | 14,000 |
| John W. Thompson | 20,000 |
| Theodore R. Thompson | 20,000 |

In January 1996, the Turner Partnership and the Thompson Partnership each paid $246,500, or a total of $493,000, to a checking account to fund the specific bequests set forth in decedent's will; these distributions reduced the estate's interests in the partnerships' assets.  Likewise, the partnerships provided funds to pay decedent's estate taxes.

On August 7, 1996, because the estate contained insufficient assets to fund all bequests in decedent's will, an assignment of partnership interest in the Turner Partnership was executed between decedent's estate and Betsy's five grandchildren, transferring partial interests in the Turner Partnership to them.

B.   Estate Tax Return

A Form 706, United States Estate (and Generation-Skipping Transfer) Tax Return, was filed on February 21, 1996.   A supplemental estate tax return was filed on December 10, 1996.

On the return, decedent's estate reported that decedent held an 87.65-percent interest in the Turner Partnership (with a value of $875,811) and a 54.12-percent interest in the Thompson Partnership (with a value of $837,691).   The return reported that decedent held 490 shares of Turner Corp. stock valued at $5,190 and 490 shares of Thompson Corp. stock valued at $7,888.   The values reported on the return were determined by applying a 40-percent combined discount for minority interest and lack of marketability to the net asset value of the assets of the partnerships.

The estate tax return reported $19,324 as prior adjusted taxable gifts pursuant to section 2001(b) related to decedent's gifts of the partnership interests in the Turner Partnership and the Thompson Partnership.   The value of the prior gifts had also been determined by applying a 40-percent combined discount for minority interest and lack of marketability.

C.   Notice of Deficiency

Respondent issued a notice of deficiency determining a $707,054 deficiency in Federal estate tax.  In the notice of deficiency, respondent increased the values of decedent's interests in the limited partnerships and increased the amount of taxable gifts related to decedent's lifetime gifts of partnership interests in those partnerships.

Respondent determined that the value of decedent's interest in the Thompson Partnership was $1,396,152, rather than $837,691, and the value of his interest in the Turner Partnership was $1,717,977, rather than $875,811.  As a result of those determinations, respondent increased decedent's taxable estate by $1,400,627.

Respondent also determined that the value of decedent's 490 shares of Thompson Corp. was $13,977, rather than $7,888, and the value of his 490 shares of Turner Corp. was $4,094, rather than $5,190.  As a result of those determinations, respondent increased decedent's taxable estate by $4,993.

Respondent's notice of deficiency also proposed to increase the prior taxable gifts from $19,324 to $166,167.

OPINION

As a general rule, section 2001(a) of the Internal Revenue Code imposes a Federal tax "on the transfer of the taxable estate of every decedent who is a citizen or resident of the United States."  Section 2001(b) provides that the estate tax is based

upon the value of the taxable estate, plus taxable gifts made after 1976 and not includable in the gross estate, less gift taxes payable on post-1976 taxable gifts. A decedent's taxable estate is determined by determining the value of the decedent's gross estate and by deducting therefrom those deductions provided for in sections 2053 through 2056. Sec. 2051.

The parties in this case disagree as to whether decedent's gross estate includes (1) the value of interests in family limited partnerships and in the corporate general partner of those partnerships that decedent possessed at death or transferred prior to death (and if so, the value of such interests), or (2) pursuant to section 2036(a), the value of the property which decedent transferred to the family limited partnerships and related corporate general partners.

Decedent's estate maintains that decedent's gross estate includes the value of his interests in the family limited partnerships (not the value of the property transferred by him to the partnerships) and that the value of each of his partnership interests at the date of transfer (that is, the date of the gift or the date of decedent's death) is decedent's proportionate share of the fair market value of the assets of the partnership at the date of transfer, discounted by 40 percent to reflect lack of control as well as a lack of marketability.

On the other hand, asserting two alternative theories,

respondent contends that the full fair market value of the assets decedent contributed to the partnerships is includable in decedent's gross estate.

Respondent argues first that the partnerships lacked economic substance and thus should be disregarded for transfer tax purposes. Alternatively, respondent argues because decedent retained the economic benefit and control of the transferred assets, section 2036(a) applies so that the date-of-death value of the assets decedent transferred to the partnerships is includable in decedent's gross estate. Finally, respondent asserts that if the partnerships are recognized for estate tax purposes and if section 2036(a) does not apply, then the amount of the combined minority and lack of marketability discounts to apply in valuing decedent's interests in the partnerships is less than 40 percent, as claimed by decedent's estate.

I.   Burden of Proof

As a preliminary matter, decedent's estate maintains that the issues of (1) whether the partnerships are to be recognized for estate tax purposes, and (2) the applicability of section 2036 are new matters which were not raised in the notice of deficiency. The estate thus concludes that the burden of proof as to those issues is placed upon respondent. We agree.

Generally, except as otherwise provided by statute or

determined by the Court, the burden of proof is on the taxpayer. Rule 142(a); <u>Welch v. Helvering</u>, 290 U.S. 111, 115 (1933).[10]  The burden of proof is on the Commissioner, however, in respect of any new matter not raised in the notice of deficiency, increases in deficiency, and affirmative defenses raised by the Commissioner in an answer.  Rule 142(a).

A notice of deficiency must "describe the basis" for the tax deficiency.  Sec. 7522.  In some situations, failure to describe the basis for the tax deficiency in the notice of deficiency results in a new matter being raised under Rule 142(a).  <u>Shea v. Commissioner</u>, 112 T.C. 183, 197 (1999); <u>Wayne Bolt & Nut Co. v. Commissioner</u>, 93 T.C. 500, 507 (1989); <u>Estate of Ballantyne v. Commissioner</u>, T.C. Memo. 2002-160.  A new matter is raised when the basis or theory on which the Commissioner relies is not stated or described in the notice of deficiency and the new theory or basis requires the presentation of different evidence.  <u>Wayne Bolt & Nut Co. v. Commissioner</u>, <u>supra</u> at 507.  In such situation, the burden of proof is placed on the Commissioner with respect to that issue. <u>Id.</u>

---

[10]  In certain circumstances, if the taxpayer introduces credible evidence with respect to any factual issue relevant to ascertaining the proper tax liability, sec. 7491 places the burden of proof on the Commissioner.  Sec. 7491(a); Rule 142(a)(2). Decedent's estate does not contend that sec. 7491 applies in this case.

In the case herein, respondent's notice of deficiency increased the value of decedent's interest in the Turner Partnership from $875,811, as reported on the return, to $1,717,977, and increased the value of decedent's interest in the Thompson Partnership from $837,691, as reported on the return, to $1,396,152. Respondent explained the changes to the value of his partnership interests as follows: "The 20% minority discount and 20% lack of marketability discount has been disallowed on each of the above limited partnerships." In addition, respondent decreased the value of decedent's Turner Corp. stock from $5,190, as reported on the return, to $4,094, and increased the value of his Thompson Corp. stock from $7,888, as reported on the return, to $13,977.

In an amendment to the answer, respondent asserted that the limited partnerships and the two family corporations should be disregarded for Federal estate tax purposes and that the property includable in decedent's gross estate is his share of the underlying assets owned by the partnerships as of the date of his death. In the alternative, respondent asserted in the amendment to the answer that with respect to the assets transferred by decedent to the partnerships, decedent retained control and enjoyment sufficient to include the date-of-death value of those assets in the gross estate pursuant to section 2036(a).

The adjustments made by respondent in the notice of deficiency resulted from respondent's disallowance of any discounts for

minority interest or lack of marketability.  The disallowance of those discounts did not call into question the economic substance of the partnerships or raise the applicability of section 2036. Moreover, the amount of discount for lack of control and marketability requires different evidence than that required for the matters first raised in the amendment to the answer. Entitlement to the discounts requires proof that a willing buyer would pay less for decedent's interest in the partnerships than net asset value because the interests did not have control over the partnership and because there was no ready market for the sale of the partnership interests.  Evidence required to establish that the entities should be respected for estate and gift tax purposes includes evidence that the entities were properly established under State law and that other formalities have been followed.  Evidence required to prove that section 2036(a) does not apply includes evidence that decedent did not retain the enjoyment of the property or control over who has the enjoyment of the property or that decedent transferred the property for adequate consideration.  See infra pp. 33-49.  These are new matters raised in the amendment to the answer.

II.  Whether the Turner Partnership and the Thompson Partnership Will Be Recognized for Federal Estate Tax Purposes

Respondent contends that the Thompson Partnership and the Turner Partnership should be disregarded for Federal tax purposes because they lack economic substance and business purpose.  "Mere

suspicion and speculation about a decedent's estate planning and testamentary objectives are not sufficient to disregard an agreement in the absence of persuasive evidence that the agreement is not susceptible of enforcement or would not be enforced by parties to the agreement." Estate of Strangi v. Commissioner, 115 T.C. 478, 485 (2000), affd. on this issue, revd., and remanded 293 F.3d 279, 282 (5th Cir. 2002); Hall v. Commissioner, 92 T.C. 312, 335 (1989).

The Thompson Partnership and Thompson Corp. were validly formed pursuant to Colorado law, and the Turner Partnership and Turner Corp. were validly formed pursuant to Pennsylvania law. Potential purchasers of decedent's assets would not disregard the partnership. Thus, the partnerships had sufficient substance to be recognized for Federal estate and gift tax purposes. Knight v. Commissioner, 115 T.C. 506, 513-515 (2000); Estate of Strangi v. Commissioner, supra; Dailey v. Commissioner, T.C. Memo. 2001-263.

III. Whether the Assets Decedent Transferred to the Partnerships Should Be Included in Decedent's Gross Estate Under Section 2036(a)

Section 2051 defines the "taxable estate" as "the value of the gross estate, less applicable deductions." Section 2031(a) specifies that the gross estate comprises "all property, real or personal, tangible or intangible, wherever situated". Section 2033 broadly states that "The value of the gross estate shall include the value of all property to the extent of the interest therein of

the decedent at the time of his death." Sections 2034 through 2045 include in the gross estate several narrowly defined classes of assets. Among these specific sections is section 2036, which reads in pertinent part as follows:

SEC. 2036. TRANSFERS WITH RETAINED LIFE ESTATE.

(a) General Rule.--The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, under which he has retained for his life or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death--

(1) the possession or enjoyment of, or the right to the income from, the property, or

(2) the right, either alone or in conjunction with any person, to designate the persons who shall possess or enjoy the property or the income therefrom.

Section 2036(a) effectively includes in the gross estate the full fair market value, at the date of death, of all property transferred in which the decedent had retained an interest, rather than the value of only the retained interest. Fidelity-Philadelphia Trust Co. v. Rothensies, 324 U.S. 108 (1945). This furthers the legislative policy to "include in a decedent's gross estate transfers that are essentially testamentary--i.e., transfers which leave the transferor a significant interest in or control over the property transferred during his lifetime." United States v. Estate of Grace, 395 U.S. 316, 320 (1969). Thus, an asset

transferred by a decedent while he was alive cannot be excluded from his gross estate unless he "absolutely, unequivocally, irrevocably, and without possible reservations, parts with all of his title and all of his possession and all of his enjoyment of the transferred property." Commissioner v. Estate of Church, 335 U.S. 632, 645 (1949). Application of section 2036(a) depends upon practical considerations; its effects are not dependent upon "'various niceties of the art of conveyancing'". Id. at 642 (quoting Klein v. United States, 283 U.S. 231, 234 (1931)).

A.   Whether Decedent Retained Possession, Enjoyment, or the Right to the Income From the Transferred Property During His Lifetime; Section 2036(a)(1)

For purposes of section 2036(a)(1), a transferor retains the enjoyment of property if there is an express or implied agreement at the time of the transfer that the transferor will retain the present economic benefits of the property, even if the retained right is not legally enforceable. See Guynn v. United States, 437 F.2d 1148, 1150 (4th Cir. 1971); Estate of McNichol v. Commissioner, 265 F.2d 667, 671 (3d Cir. 1959), affg. 29 T.C. 1179 (1958); Estate of Reichardt v. Commissioner, 114 T.C. 144, 151 (2000); see also sec. 20.2036-1(a) Estate Tax Regs. The existence of such an implied agreement or understanding can be inferred from the facts and circumstances surrounding both the transfer itself and the subsequent use of the property. Estate of Reichardt v. Commissioner, supra; Estate of Spruill v. Commissioner, 88 T.C.

1197, 1225 (1987); Estate of Rapelje v. Commissioner, 73 T.C. 82, 86 (1979).

In this case, the circumstances surrounding establishment of the partnerships show that, at the time of the transfer, there was an implied agreement or understanding that decedent would retain the enjoyment and economic benefit of the property he had transferred. Before the partnerships were formed, Betsy sought assurances from the financial advisers that decedent would be able to withdraw assets from the partnerships in order to make cash gifts each year to his children, grandchildren, and great grandchildren. In late November 1993 after the partnerships were formed, George asked the advisers how decedent could get $40,000 out of the partnerships to give as Christmas presents. The implied agreement among decedent, Robert, Betsy, and George that decedent would retain the enjoyment and economic benefit of the transferred property is reflected also by the distributions made by the partnerships to decedent. Late in 1993 and again in 1994, both the Turner Partnership and the Thompson Partnership made distributions to decedent of $40,000 so that he could continue his practice of giving substantial gifts at Christmastime to his family members.

The circumstances also demonstrate an understanding that decedent's interest in the transferred property would last until his death. When the partnerships were established, decedent parted with almost all of his wealth, retaining enough to support himself

for less than 2 years.  Betsy's correspondence in early 1995 to Robert shows that the amount decedent retained was insufficient-- his original holdings had diminished to $31,806, while his expenses for the prior year totaled $57,202.  Betsy informed Robert that decedent would need "an infusion" of funds to cover the balance of decedent's anticipated 1995 expenses.  She proposed that the Turner Partnership and the Thompson Partnership transfer assets of equal value to their father.  In March 1995 the Thompson Partnership distributed $12,500 to decedent.

We are not persuaded otherwise by the insistence of decedent's estate that decedent always asked Betsy and Robert, in their respective capacity as officers of the corporate general partners of their partnerships, for the cash decedent needed to provide Christmas gifts.[11] The fact that decedent requested those sums does not vitiate the existence of an understanding that he would receive them.

Here, decedent's outright transfer of the vast bulk of his assets to the partnerships would have deprived him of the assets

---

[11] Further, sec. 2036(a) applies when the decedent has "the right, either alone or in conjunction with any person, to designate the persons who shall possess or enjoy the property or the income therefrom."  Sec. 2036(a)(2).  (Emphasis added.)  The parties have limited their arguments to the application of sec. 2036(a)(1). Since we find that decedent retained enjoyment of the property within the meaning of sec. 2036(a)(1), we leave to another day the application of sec. 2036(a)(2) to family limited partnerships such as those existing in this case.

needed for his own support. Thus, the transfers from the partnerships to decedent can only be explained if decedent had at least an implied understanding that his children would agree to his requests for money from the assets he contributed to the partnerships, and that they would do so for as long as he lived.

While we acknowledge that, as a result of the creation of the partnerships, prior to decedent's death some change ensued in the formal relationship of decedent to the assets he contributed to the partnerships, we are satisfied that the practical effect of these changes during decedent's life was minimal. Decedent continued to be the principal economic beneficiary of the contributed property after the partnerships were created. Based on these facts, we conclude that nothing but legal title changed in the decedent's relationship to his assets after he transferred them to the partnerships. Estate of Reichardt v. Commissioner, supra at 152-153.

Any control over management and distributions by Betsy and Robert is likewise of little import. Documents in the record show that the composition of the portfolio changed little prior to decedent's death. We place little weight on averments concerning change, during decedent's life, in the partners' relationships to the contributed property.

In Mahoney v. United States, 831 F.2d 641, 646-647 (6th Cir. 1987) the court explained:

"The general purpose of the statute was to include in a decedent's gross estate transfers that are essentially testamentary--i.e., transfers which leave the transferor a significant interest in or control over the property transferred during his lifetime." * * * By taxing essentially testamentary transactions, section 2036(a) prevents "circumvention of federal estate tax by use of schemes which do not significantly alter lifetime beneficial enjoyment of property supposedly transferred by a decedent." * * * The applicability of section 2036(a), therefore, is not controlled by the "various niceties of the art of conveyancing," * * * but is instead dependent upon "the nature and operative effect of the transfer," * * *. As such, the statute operates to tax transfers of property "that are too much akin to testamentary dispositions not to be subjected to the same excise." * * *

We have applied the aforementioned principles to the creation of family partnerships. We have often held that section 2036(a) applies to return to the estate the assets of an elderly and wealthy individual who had placed the bulk of his or her assets into a partnership that is controlled by that individual and his family, while the individual possessed continued use of the assets so transferred. See Estate of Reichardt v. Commissioner, 114 T.C. 144 (2000); Estate of Harper v. Commissioner, T.C. Memo. 2002-121; Estate of Schauerhamer v. Commissioner, T.C. Memo. 1997-242.

In light of decedent's personal situation, the fact that the contributed property constituted the majority of decedent's assets, including nearly all of his investments, the establishment of the partnerships is far more consistent with an estate plan than with any sort of arm's-length joint enterprise between partners. In summary, we are satisfied that the partnerships were created

principally as an alternate vehicle through which decedent would provide for his children at his death.  Estate of Schauerhamer v. Commissioner, supra.  We conclude that decedent retained enjoyment of the contributed property within the meaning of section 2036(a)(1).

B.    Whether Decedent Transferred Property to the Partnership in a Bona Fide Sale for Full and Adequate Consideration

Section 2036(a) does not apply to a transfer that is "a bona fide sale for an adequate and full consideration in money or money's worth".  Decedent's estate contends that decedent's transfer of his assets to the partnerships falls within that exception.  We disagree.  We believe that decedent's transfer of his property to the partnerships does not constitute "a bona fide sale for an adequate and full consideration", within the meaning of section 2036(a).

The exemption under section 2036(a) is limited to those transfers where the transferor has received full consideration in a genuine arm's-length transaction.  Estate of Goetchius v. Commissioner, 17 T.C. 495, 503 (1951).  The exemption is not allowed where there is only contractual consideration but not "adequate and full consideration in money or money's worth."  Id.

When a family partnership is only a vehicle for changing the form in which the decedent held his property--a mere "recycling of value"--the decedent's receipt of a partnership interest in

exchange for his testamentary assets is not full and adequate consideration within the meaning of section 2036.  In Estate of Harper v. Commissioner, supra, we rejected the taxpayer's argument that the decedent's receipt of a partnership interest, in exchange for his trust assets, was a "bona fide sale for an adequate and full consideration in money or money's worth".  We observe therein that in reality, the assets were not invested in a business enterprise, they were only "recycled".  And where a transaction involves only the genre of value "recycling" and does not appear to be motivated primarily by legitimate business concerns, no transfer for consideration within the meaning of section 2036(a) has taken place.  Id.

In Estate of Harper v. Commissioner, supra, we further observed that our interpretation of "adequate consideration" for transfers to family partnerships was consistent with and supported by our holdings in other cases, including Estate of Reichardt v. Commissioner, supra, and Estate of Schauerhamer v. Commissioner, supra.

In contrast to those situations involving "alternative testamentary vehicles", we have also addressed cases wherein a decedent has transferred his or her assets into a valid functioning business enterprise.  In those cases, we generally have found that the transfer was made for full and adequate consideration.  As such, the decedent's receipt of income from the enterprise will not

cause the value of the property he contributed to the enterprise to be returned to his estate. See, e.g., Estate of Harrison v. Commissioner, T.C. Memo. 1987-8; Estate of Michelson v. Commissioner, T.C. Memo. 1978-371. In those cases, there was no expressed or implied agreement between the partners in the partnerships that the decedents could continue to use, possess, or enjoy partnership property, within the meaning of section 2036(a).

In the case before us, however, the transactions were not motivated by the type of legitimate business concerns that furnished "adequate consideration" as described in Estate of Harrison v. Commissioner, supra, and Estate of Michelson v. Commissioner, supra. Further, we have found that in the case before us, the partners did, in fact, have an expressed or implied understanding that decedent could continue to use the assets he transferred to the partnerships.

A number of factors influence our finding. Initially, we note that none of the individual partners in either of the partnerships was involved in the conduct of an active business. Additionally, it is clear that Robert, Betsy, and George did not actually pool their assets with those of decedent. To the extent the partnerships could have generated income resulting from their separate activities, they arranged matters so that any such income went to them directly, and not to the partnerships. For example, in Robert's case, any income from the sale of the mules went to him

individually, not to the partnership. In the case of Betsy and George, their partnership agreement was amended in 1994 so that George, and not the partnership, received all income from the sale of timber on the Vermont property that prior to the amendment George had contributed to the partnership. Thus, although each of decedent's children (and/or their spouses) invested in the partnerships, they kept their own assets, as well as any income those assets may have generated, effectively separate from those of decedent. They, like decedent, merely "recycled" their property through the partnership form.[12]

Moreover, although decedent's stocks and bonds formed the principal assets of both partnerships, no substantial change in investment strategy or activity took place from the date decedent transferred the assets to the partnerships to the date of his death.

In the final analysis, neither decedent nor his family conducted the partnerships in a businesslike manner. None of the parties involved in the partnerships joined together with the intent to either form business enterprises or otherwise to conduct

---

[12] The practice continued after decedent's death. When Betsy and George sold their private residence, Woodside Farm, they included the 22 acres of Woodlands Property adjacent to their home in the same sale. After the sale, they allocated to the Turner Partnership an amount of the Woodside Farm/Woodlands Property sales proceeds that exactly equaled the partnership's basis in the Woodlands Property. In so doing, they effectively eliminated any partnership gain or loss from the sale for Federal tax purposes.

any trade or business. The partnerships did not engage in transactions with anyone outside the family; loans and gifts were made to family members only. The lending activities of the partnerships lacked any semblance of legitimate business transactions. This exclusivity might be consistent with decedent's generosity towards his family members, but it was inconsistent with any valid business operation.[13] In reality, these loans continued to be testamentary in nature, using decedent's money as a source of financing for the needs of individual family members, not for business purposes.

In conclusion, we find that there was no bona fide sale for adequate and full consideration. Consequently, we hold that the full date-of-death value of the assets that decedent transferred from his trusts to the Thompson and Turner Partnerships is includable in his gross estate pursuant to section 2036(a).

---

[13] After decedent's death, the Turner Partnership and Thompson Partnership continued making loans to family members. Some of these loans included underwriting Phoebe's $40,000 loss in the construction of Lewisville Properties, an auto loan of $15,000 to Phoebe (since partially repaid), and a loan to Betsy's 17-year old grandson to purchase a lobster boat. In addition, the Turner Partnership made loans to Betsy's son, William, to start a rose-growing business, and made additional loans for his business, despite the ultimate failure of the business venture. There is nothing to support that either Robert or Betsy made partnership investment decisions in their children's and grandchildren's ventures with the same careful consideration one would expect to be exercised by a managing partner of a partnership having a valid business purpose.

C. Amount Included in Decedent's Estate Under Section 2036(a)

We now turn to the issue of which assets are to be included in decedent's gross estate, bearing in mind that the burden of proof is on respondent.

The assets of the Turner Partnership (and the values of those assets) as of July 1993 (upon contribution to the partnership) and May 15, 1995 (decedent's date of death), were as follows:

|  | 7/93 | | 5/15/95 | |
|---|---|---|---|---|
|  | Shares | Value | Shares | Value |
| Decedent's contribution | | | | |
| Municipal bonds | | | | |
| Chester Co | --- | $50,180 | --- | 15,118 |
| Madison Co | --- | 10,327 | --- | 12,000 |
| PA Higher Ed | --- | 50,472 | --- | 5,020 |
| Puerto Rico | --- | 5,246 | --- | 5,016 |
| Dela. State | --- | 52,131 | --- | --- |
| Stocks | | | | |
| Atlantic Richfield | 100 | 11,575 | 100 | 11,475 |
| Coca Cola | 2,400 | 103,800 | 2,400 | 138,900 |
| GTE | 11,200 | 404,600 | 11,200 | 383,600 |
| General Electric | 1,600 | 157,600 | 3,200 | 184,400 |
| Intercap Qual Muni Inv. | 2,000 | 32,000 | 2,950 | 42,775 |
| Intercap Qual Muni Inc. | 1,200 | 18,150 | --- | --- |
| IBM | 426 | 18,957 | 426 | 40,470 |
| Johnson & Johnson | 600 | 21,900 | 600 | 38,175 |
| Merck | 900 | 27,563 | 900 | 38,025 |
| Meridian Bankcorp | 1,000 | 32,125 | 1,000 | 33,625 |
| 3M | 200 | 21,000 | 400 | 24,550 |
| Phila. Elec./PECO Energy | 500 | 15,750 | 500 | 13,375 |
| Petrolite | 3,000 | 105,000 | 3,000 | 93,000 |
| Xerox | 1,800 | 131,400 | 1,800 | 217,575 |
| Mutual funds | | | | |
| John Hancock | 900 | 15,894 | 900 | 19,710 |
| Margin loan | --- | --- | --- | (208,056) |
| Loans receivable | | | | |
| Phoebe Turner | --- | 15,000 | --- | 14,961 |
| William Turner | --- | 100,000 | --- | 98,519 |
| George Turner, Jr. | --- | 10,000 | --- | 9,843 |
| Decedent's total | | 1,410,670 | | 1,232,076 |
| | | | | |
| Betsy/George's Contribution | | | | |
| Cash (checking account) | --- | 1,000 | --- | --- |
| Real Property | | | | |
| Vermont property | --- | 49,000 | --- | 49,000 |
| Woodlands | --- | --- | --- | 110,000 |
| Woodside Properties | --- | --- | --- | 102,416 |
| Betsy's total | | 50,000 | | 261,416 |

|  | 7/93 | | 5/15/95 | |
| --- | --- | --- | --- | --- |
|  | Shares | Value | Shares | Value |
| New assets |  |  |  |  |
| First National Bank account |  |  |  |  |
| General | --- | --- | --- | 3,404 |
| Lewisville | --- | --- | --- | 1,479 |
| Real Property |  |  |  |  |
| Lewisville property | --- | --- | --- | 154,500 |
| Cash value life insurance |  |  |  |  |
| George | --- | --- | --- | 8,907 |
| Betsy | --- | --- | --- | 1,821 |
| Total |  |  |  | 10,728 |
| Unearned premium--<br>life insurance | --- | --- | --- | 15,905 |
| Loans receivable |  |  |  |  |
| William Turner, IV | --- | --- | --- | 13,171 |
| Robert & Lorraine Turner | --- | --- | --- | $48,275 |
| Bill's Bloom, Inc. | --- | --- | --- | 8,000 |
| Accrued int. & div. | --- | --- | --- | 3,032 |
| Unattributed total |  |  |  | 258,494 |
| Total assets |  | 1,460,670 |  | 1,751,986 |

The securities totaling $1,232,076 were assets transferred to the Turner Partnership by decedent. In addition to those securities, new assets that derived from assets transferred by decedent are included in decedent's taxable estate under section 2036(a). The Lewisville Property was funded with the margin loan attributable to the securities contributed by decedent. None of the real estate contributed by George to the partnership produced any income. At most, the $1,479 in the Lewisville Properties account could be attributed to the $1,000 contributed by George on the formation of the partnership. The remaining $257,015 ($258,494 - $1,479) of the new assets held by the partnership at decedent's death must have derived from the assets contributed by decedent. We find, therefore, that assets totaling $1,489,091 ($1,232,076 + $257,015) held by the Turner Partnership at the date of decedent's death are included in the taxable estate under section 2036(a).

The assets of the Thompson Partnership (and the values of those assets) as of July 1993 (upon contribution to the partnership) and May 15, 1995 (decedent's date of death), were as follows:

|  | 7/93 | | 5/15/95 | |
|---|---|---|---|---|
|  | Shares | Value | Shares | Value |
| Decedent's contributions | | | | |
| Municipal bonds | | | | |
| Dist. Columbia | --- | $53,685 | --- | $50,141 |
| Dover Dela. Wtr & Swr | --- | 27,498 | --- | --- |
| Dover Dela. Wtr & Swr | --- | 22,019 | --- | 20,813 |
| Orlando Waste | --- | 5,208 | --- | --- |
| Dela. Hlth | --- | 33,548 | --- | 26,880 |
| Tampa Wtr & Swr | --- | 43,713 | --- | --- |
| Total | | 185,671 | | 97,834 |
| Stocks | | | | |
| Atlantic Richfield | 100 | 11,575 | 100 | 11,475 |
| Coca Cola | 2,400 | 103,800 | 2,400 | 138,900 |
| GTE | 9,200 | 332,350 | 9,200 | 315,100 |
| General Electric | 1,600 | 157,600 | 3,200 | 184,400 |
| Intercapital invest | 2,000 | 32,000 | 2,550 | 36,975 |
| Intercapital income | 800 | 12,100 | 1,000 | 13,375 |
| IBM | 400 | 17,800 | 400 | 38,000 |
| Johnson & Johnson | 600 | 21,900 | 600 | 38,175 |
| Merck | 900 | 27,563 | 900 | 38,025 |
| Meridian Bankcorp | 1,000 | 32,125 | 1,000 | 33,625 |
| 3M | 200 | 21,000 | 400 | 24,550 |
| Phila. Elec./PECO Energy | 500 | 15,750 | 500 | 13,375 |
| Xerox | 1,800 | 131,400 | 1,800 | 217,575 |
| Total | | 916,963 | | 1,103,550 |
| Mutual Funds | | | | |
| John Hancock Freedom | 900 | 15,894 | 900 | 19,710 |
| Loans receivable | | | | |
| Amy Thompson | --- | 139,739 | --- | 103,451 |
| Ted Thompson | --- | 14,064 | --- | 9,348 |
| Margaret Thompson | --- | 140,000 | --- | 116,852 |
| Total | | 293,803 | | 229,651 |
| Decedent's total | | 1,412,331 | | 1,450,745 |
| Robert's contributions | | | | |
| Mutual Funds | | | | |
| Equity income | --- | 64,811 | --- | 61,486 |
| European stock | --- | 10,673 | --- | --- |
| Intl stock | --- | 32,710 | --- | 40,348 |
| Japan fund | --- | 35,268 | --- | --- |
| New American growth | --- | 37,660 | --- | --- |
| New Asia | --- | 22,449 | --- | 12,495 |
| Science & Technology | --- | 58,236 | --- | 68,912 |
| High yield | --- | 5,597 | --- | --- |
| Intl bond | --- | 103,905 | --- | 128,903 |
| Prime Reserve-cash | --- | 1,499 | --- | --- |
| Total | | 372,808 | | 312,144 |

| | 7/93 | | 5/15/95 | |
|---|---|---|---|---|
| | Shares | Value | Shares | Value |
| Ranch in Norwood, CO | --- | 460,000 | --- | 595,000 |
| Robert's total | | 832,808 | | 907,144 |
| **New Assets** | | | | |
| Cash | --- | --- | --- | 57,097 |
| Stock | | | | |
| Barrick Gold | --- | --- | 700 | 16,363 |
| Fluor Corp. | --- | --- | 300 | 15,188 |
| Glaxo Wellcome PLC | --- | --- | --- | 20,813 |
| Mutual Funds | | | | |
| Latin America | --- | --- | --- | 18,444 |
| Mid-cap growth | --- | --- | --- | 45,953 |
| U.S. Treasury | --- | --- | --- | 43,926 |
| Accrued int & div | --- | --- | --- | 4,066 |
| Total Unattributed assets | | | | 221,850 |
| Total Assets | | 2,245,138 | | 2,579,739 |

The new assets held by the Thompson Partnership on the date of decedent's death could have derived from mutual funds contributed to the partnership by Robert. We are not persuaded that any of the new assets derived from the assets contributed by decedent. We find, therefore, that assets totaling $1,450,745 held by the Thompson Partnership at the date of decedent's death are included in the taxable estate under section 2036(a).

The record establishes that George and Robert retained enjoyment and control over the property they contributed to the partnership. Decedent's interests in the partnerships had no value attributable to the property contributed by George and Robert to the partnerships. We find, therefore, that no additional value attributable to the partnerships over the value of the property included in decedent's estate under section 2036(a) is included in decedent's taxable estate.

Further, decedent's stock in Turner Corp. and Thompson Corp. had no value apart from the corporations' interests in the partnerships. The value of decedent's stock in the corporations is included in the value of the assets included in his estate under section 2036(a). We find, therefore, that no additional value attributable to such stock is included in computing decedent's taxable estate.

D.  Adjusted Taxable Gifts

Decedent's estate's estate tax return included, as part of the gross estate, $19,324 as "adjusted taxable gifts" pursuant to section 2001(b) for lifetime transfers of decedent's interest in the partnerships. Respondent's notice of deficiency proposed to increase this amount to $166,167.

Neither party addresses the impact of the application of section 2036(a) on the value of the prior gifts of partnership interests. We have found that pursuant to section 2036(a) decedent's taxable estate includes the full value as of decedent's death of assets transferred by him to the partnerships and held by the partnerships at decedent's death. We have also found that decedent's interests in the partnerships had no value apart from the assets he contributed to the partnerships because Betsy and Robert maintained control over the property they transferred to their respective partnerships. Therefore, we hold that in computing the proper estate tax due, it is not appropriate to

include a separate value attributable to decedent's lifetime transfers of partnership interests. See <u>Estate of Harper v. Commissioner</u>, T.C. Memo. 2002-121.

E.   <u>Conclusion</u>

The value of decedent's interests in the partnerships as reported on decedent's estate tax return and as determined by respondent in the notice of deficiency and the value of the assets that we have found are to be included in the estate under section 2036(a) are as follows:

|  | Estate Tax Return | Notice of Deficiency | Sec. 2036 |
|---|---|---|---|
| Thompson Partnership | $837,691 | $1,396,152 | $1,450,745 |
| Turner Partnership | 875,811 | 1,717,977 | 1,489,091 |
| Thompson Corp. | 7,888 | 13,977 | 0 |
| Turner Corp. | 5,190 | 4,094 | 0 |
| Prior taxable gifts | 19,324 | 166,167 | 0 |
| Total | 1,745,904 | 3,335,177 | <u>2,939,836</u> |

To reflect the foregoing,

<u>Decision will be entered</u>

<u>under Rule 155</u>.
