

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-1-2004

# Turner v. Commissioner IRS

Precedential or Non-Precedential: Precedential

Docket No. 03-3173

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"Turner v. Commissioner IRS" (2004). 2004 Decisions. Paper 291.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/291

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES
COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 03-3173

BETSY T. TURNER,
Executrix of the Estate of
Theodore Thompson, Deceased,

Appellant

v.

COMMISSIONER OF
INTERNAL REVENUE

On Appeal from the
United States Tax Court
Tax Court Docket No. 7578-99
(Honorable Julian I. Jacobs)

Argued April 21, 2004

Before: SCIRICA, *Chief Judge*,
ROSENN and GREENBERG,
*Circuit Judges*

(Filed: September 1, 2004)

Victor F. Keen, Esquire (Argued)
Thomas W. Ostrander, Esquire
Duane Morris LLP
One Liberty Place, 37th Floor
1650 Market Street
Philadelphia, Pennsylvania 19103-7396
       Attorneys for Appellant

Michael J. Haungs, Esquire (Argued)
Jonathan S. Cohen, Esquire
United States Department of Justice
Tax Division
P.O. Box 502
Washington, D.C. 20044
       Attorneys for Appellee

OPINION OF THE COURT

SCIRICA, *Chief Judge*.

This case involves the application of § 2036(a) of the Internal Revenue Code, 26 U.S.C. § 2036(a), to assets transferred inter vivos to family limited partnerships. Theodore R. Thompson transferred $2.8 million in securities and other assets to two family limited partnerships in exchange for pro-rata partnership interests. Upon his death, Thompson's estate filed a federal estate tax return which applied a forty percent discount to the value of decedent's partnership interests for lack of control and marketability. The Commissioner of Internal Revenue filed a notice of estate tax deficiency in the amount of $707,054, applying § 2036(a) to return to the gross estate the full date of death value of the transferred assets. The Tax Court sustained application of § 2036(a) after finding decedent retained lifetime control and enjoyment of the transferred assets, and concluding the transfer of assets was not a bona fide sale for adequate and full consideration. *Estate of Theodore R. Thompson v. Comm'r*, T.C. Memo 2002-246; 2002 Tax Ct. Memo LEXIS 254; 84 T.C.M. (CCH) 374 (2002). The estate appeals. We will affirm.

## I.

In the early 1990s, decedent Theodore R. Thompson, along with his son Robert Thompson and daughter Betsy Turner, began to investigate estate plans for managing his assets.[1] In April 1993, they implemented the Fortress Plan,[2] an estate plan offered by the Fortress Financial Group, Inc. that utilized family limited partnerships to protect family assets. A financial advisor to decedent's family stated the primary advantages of the Fortress Plan included: "(1) lowering the taxable value of the estate, (2) maximizing the preservation of assets, (3) reducing income taxes by having the corporate general partner provide medical, retirement, and 'income splitting' benefits for family members, and (4) facilitating family and charitable giving." *Thompson*, 84 T.C.M. at 376. The advisor also stated that, "[a]ll of the benefits above can be achieved while total control of all assets is retained by the directors of the Corporate General Partner." *Id.* Pursuant to the plan, decedent and his family formed two limited partnerships and two corporations to serve as general partners.

### A.

On April 21, 1993, decedent, his daughter Betsy and her husband George Turner formed the Turner Partnership and Turner Corporation. Decedent contributed $1,286,000 in securities, along with notes receivable from Betsy Turner's children totaling $125,000, in exchange for a 95.4% limited partnership interest in the Turner Partnership. George Turner contributed $1,000 in cash and real property in the state of Vermont valued at $49,000 in exchange for a 3.54% limited partnership interest. Turner Corporation, the sole general partner, held the remaining 1.06% interest.[3] Shares in Turner Corporation were issued to decedent (490 shares or 49%), Betsy Turner (245 shares or 24.5%),

---

[1] In 1979, decedent executed a will, subsequently amended by four codicils, which provided specific gifts to Robert Thompson, Betsy Turner, and decedent's grandchildren and great-grandchildren. The residue of decedent's estate went to a revocable trust, established on January 16, 1969. Decedent amended the trust on March 17, 1993, to create a new revocable trust funded with the assets of the 1969 trust, which then totaled approximately $1.5 million.

[2] The Tax Court previously examined inter vivos transfers to family limited partnerships created under the "Fortress Plan" in *Estate of Strangi v. Commissioner*, T.C. Memo 2003-145; 2003 Tax Ct. Memo LEXIS 144; 85 T.C.M. (CCH) 1331 (2003). In that case, the Tax Court applied § 2036 to return to decedent's gross estate the value of property transferred to a family limited partnership pursuant to the Fortress Plan.

[3] Turner Corporation did not pay for its partnership interest directly, but rather issued decedent a non-interest bearing promissory note in the amount of $15,000 for its 1.06% interest.

2

George Turner (245 shares or 24.5%), and National Foundation, Inc. (20 shares or 2%), an unrelated tax-exempt entity. Decedent, Betsy and George Turner served as directors and officers of Turner Corporation.

Decedent and his son Robert Thompson formed the Thompson Partnership on April 30, 1993, and the Thompson Corporation on April 21, 1993. Decedent contributed $1,118,500 in securities, along with notes receivable totaling $293,000, in exchange for a 62.27% limited partnership interest. Robert Thompson contributed mutual funds worth $372,000, and a ranch property in Norwood, Colorado, appraised at $460,000, in exchange for a 36.72% limited partnership interest. Thompson Corporation, as general partner, held the remaining 1.01% interest. Decedent and Robert Thompson each held 490 shares (49%) of Thompson Corporation. Robert H. Thompson, an unrelated third party, held the remaining 2% interest. Robert Thompson, Robert H. Thompson and decedent served as officers and directors of Thompson Corporation.

As of July 1993, decedent, then age ninety-five, had transferred $2.8 million in assets—$2.5 million in the form of marketable securities—to the Turner and Thompson Partnerships. Decedent retained $153,000 in personal assets, and received an annual income of $14,000 from two annuities and Social Security. At the time of transfer, decedent had annual expenses of $57,202, and an actuarial life

expectancy of 4.1 years. Theodore R. Thompson died on May 15, 1995.

## B.

### 1.

The Turner Partnership assets consisted primarily of marketable securities contributed by decedent, which the partnership continued to hold in decedent's brokerage account with minimal post-transfer trading. After formation, however, individual partners contributed additional assets to the Turner Partnership. In December 1994, Betsy and George Turner contributed a 22-acre parcel of land adjacent to their private residence, known as the Woodlands Property. Betsy and George Turner also assigned to the Turner Partnership their interests in a real estate partnership, known as Woodside Properties, which held six apartment units. Phoebe and Betsy Turner retained title to the underlying real estate assets after transfer.

The Turner Partnership engaged in several business transactions, although none produced economic gains for the partnership. The structure of the Turner Partnership facilitated this result. The partners amended the Turner Partnership agreement in 1994, retroactively effective to April 23, 1993, to allocate all gains and losses from, and distribution of, real estate contributed to the partnership to the individual contributing partners. As a result, income from the sale of timber from the Vermont property went directly to the contributing partner, George Turner, and not to the partnership as a whole.

3

Likewise, when Betsy and George Turner sold the Woodlands Property along with their residence for $550,000, the Turner Partnership received $12,351 of the proceeds, an amount equal to its basis[4] in the property.

In 1993, the Turner Partnership invested $186,000 in a modular home construction project brokered by Phoebe Turner known as the Lewisville Properties. The property was sold in 1995 for a loss of $60,000. Phoebe Turner received a $9,120 commission on the transaction.

The Turner Partnership also made loans to members of the Turner family. Although the partnership formally charged family members interest on these loans, interest payments were often late or not paid at all, and loans were frequently reamortized. But the partnership never pursued enforcement action against any of its debtors nor made loans to anyone outside the Turner family.

---

[4]*See Black's Law Dictionary* 145 (7th ed. 1999) (defining "basis" as the "value assigned to a taxpayer's investment in property and used primarily for computing gain or loss from a transfer of the property"); Eitan A. Avneyon, *Dictionary of Finance* 53 (1987) (defining "basis" as "the cost of an asset, or the asset's value (in the case of an asset obtained by some means other than purchase) used to calculate depreciation, profits and capital gains.").

**2.**

Like the Turner Partnership, most of the Thompson Partnership assets consisted of marketable securities contributed by decedent and Robert Thompson. Here again, post-transfer trading in the securities was low. The only other operational activities of the Thompson Partnership related to the Norwood, Colorado ranch contributed by Robert Thompson. Robert previously used the ranch as his primary residence, and continued to do so after transfer paying an annual rent of $12,000. Likewise, Robert Thompson continued to raise mules on the property and directly received income from the sale of mules. The record does not demonstrate any other business or commercial activities on the Norwood ranch. Nevertheless, for the years 1993 through 1995, the Thompson Partnership paid the Thompson Corporation an annual management fee for the Norwood ranch in the amounts of $23,625, $45,000, and $47,500, respectively. Thompson Corporation in turn paid Robert Thompson an annual salary of $32,001, and Karen Thompson, Robert's wife, a monthly salary of $350. Thompson Corporation also carried insurance on Robert and Karen Thompson, and paid various personal expenses. The Thompson Partnership claimed losses from the operation of the ranch on its tax returns for the years 1993 through 1996.

**3.**

In addition to the foregoing activities, both the Turner and Thompson

Partnerships made distributions of cash and partnership interests to decedent during his lifetime. In 1993, the Turner and Thompson Partnerships made cash distributions of $40,000 each to decedent which he used to provide holiday gifts to family members. Again in 1995, the Thompson and Turner Partnerships made cash distributions to decedent of $45,500 and $45,220 respectively. During the same time period, decedent made gifts of interests in both partnerships to individual family members. In March 1995, the Thompson Partnership distributed $12,500 to decedent to pay for certain personal expenses.[5] All of these distributions were reflected on decedent's Schedule K-1 and recorded as reductions in his partnership capital accounts.

## C.

As noted, decedent died testate on May 15, 1995, at age ninety-seven. At the time of his death, decedent held approximately $89,000 in liquid assets, a promissory note in principal amount of approximately $9,000, a majority interest in the Turner and Thompson Partnerships, and shares in their respective corporate general partners. On or about May 27, 1995, the Turner and Thompson Partnerships respectively sold $347,000

and $350,000 in securities to partially fund bequests in decedent's will and pay decedent's estate taxes.

Decedent's executors filed a federal estate tax return, Form 706, with the Internal Revenue Service on February 21, 1996, and filed a supplemental return on December 10, 1996. The estate reported decedent held a 87.65% interest in the Turner Partnership and a 54.12% interest in the Thompson Partnership valued at $875,811 and $837,691 respectively. The estate reported decedent held 490 shares of Turner Corporation stock and 490 shares of Thompson Corporation stock valued at $5,190 and $7,888 respectively. The estate also reported prior adjusted taxable gifts of $19,324 related to decedent's lifetime gifts of partnership interests. The estate calculated these values by applying a 40% discount rate to the net asset value of the partnerships and corporations for lack of control and marketability.

In January 1999, the IRS issued a notice of deficiency in the amount of $707,054, adjusting decedent's taxable estate from $1,761,219 to $3,203,506. The most significant adjustment involved the reported value of decedent's interests in the family limited partnerships.[6] The Commissioner explained the "20 percent

---

[5]The Tax Court found that prior to this distribution, Betsy Turner wrote a letter to Robert Thompson detailing decedent's 1994 expenses of $57,202.40 and stating decedent needed an "infusion." *Thompson*, 84 T.C.M. at 380.

[6]The Commissioner also increased the taxable estate by $4,993 for adjustments to decedent's reported interest in Thompson Corporation and Turner Corporation, and increased the reported taxable gifts from $19,324 to $166,167.

minority discount and the 20 percent marketability discount has been disallowed on each of the [Turner and Thompson] partnerships." As a result, the Commissioner increased the value of decedent's interest in the Turner Partnership from $875,811 to $1,717,977, and increased the value of his interest in the Thompson Partnership from $837,691 to $1,396,152. These adjustments increased decedent's taxable estate by $1,400,627.[7]

In its amended answer to the estate's petition for redetermination in the Tax Court, the Commissioner asserted the family partnerships and corporations should be disregarded for tax purposes, and therefore decedent's gross estate should include the undiscounted value of his pro-rata share of the underlying assets. In the alternative, the Commissioner contended the full fair market value of the assets transferred by the decedent to the Turner and Thompson Partnerships should be returned to decedent's gross estate under § 2036(a) of the Internal Revenue Code because decedent retained control and enjoyment over the transferred assets during his lifetime.

## II.

The Tax Court found the family partnerships were validly formed and properly recognized for federal estate tax purposes.[8] The court nevertheless sustained application of § 2036(a)(1)[9] to

---

[8]The Tax Court concluded the Commissioner had the burden of proof on whether the partnerships were validly formed for tax purposes, and whether the transferred assets should be returned to the estate under § 2036 because those arguments were not presented in the notice of deficiency. *See Wayne Bolt & Nut Co. v. Comm'r*, 93 T.C.M. 500, 507 (1989) (when a new theory on which the Commissioner relies is not stated or described in the notice of deficiency, the Commissioner bears the burden of proof on that issue).

[9]Section 2036(a) provides, in part:

**Transfers with retained life estate.** (a) General Rule. The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer (except in the case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, under which he has retained for his life or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death–

---

[7]Form 3228 of the statutory notice of deficiency reflected an adjustment of $1,406,933 to the gross estate. The additional adjustment resulted from the inclusion of Delaware state tax refunds for the years 1994 and 1995 in the amounts of $1,459 and $4,847.

6

return decedent's transferred assets back to the estate. The Tax Court found an implied agreement existed at the time of transfer that decedent would retain lifetime enjoyment and economic benefit of the transferred assets. In support of this finding, the court noted both Betsy and George Turner sought assurances from financial advisors that decedent would be able to withdraw assets from the partnerships to make gifts to family members, and that the partnerships in fact made such distributions to decedent. The court further noted decedent "parted with almost all of his wealth" and found this "outright transfer of the vast bulk of [decedent's] assets . . . can only be explained if decedent had at least an implied understanding that his children would agree to his requests for money from the assets he contributed to the partnerships, and that they would do so for as long as he lived." *Thompson*, 84 T.C.M. at 386-87. While acknowledging the transfers altered the "formal relationship" between decedent and his assets, the court concluded, as a practical matter, that "nothing but legal title changed." *Id.* at 387. The court summarized:

> In light of decedent's personal situation, the fact

> (1) the possession or enjoyment of, or the right to the income from, the property . . .

26 U.S.C. § 2036(a).

that the contributed property constituted the majority of decedent's assets, including nearly all of his investments, the establishment of the partnerships is far more consistent with an estate plan than with any sort of arm's-length joint enterprise between partners. In summary, we are satisfied that the partnerships were created principally as an alternate vehicle through which decedent would provide for his children at his death.

*Id.*

The court also determined the transfer was not exempt from § 2036(a) as a "bona fide sale for adequate and full consideration." The Tax Court explained that "[w]hen a family partnership is only a vehicle for changing the form in which the decedent held his property—a mere 'recycling of value'—the decedent's receipt of a partnership interest in exchange for his testamentary assets is not full and adequate consideration within the meaning of section 2036." *Id.* at 388. The Tax Court found neither partnership conducted a legitimate business enterprise, and the individual partners did not pool their assets in the partnerships. Furthermore, the court found neither partnership engaged in business transactions with anyone outside the family, and the partnership loans to family members were "testamentary in nature."

7

*Id.* at 389. As a result, the court concluded there was no transfer for "adequate and full consideration" within the meaning of § 2036(a).

Accordingly, the Tax Court applied § 2036(a)(1) to return to the gross estate the date of death value of decedent's transferred assets as well as new partnership assets derived from the assets contributed by decedent.[10] The Tax Court also found decedent's stock in Turner Corporation and Thompson Corporation had no value apart from those corporations' interests in the family partnerships, and thus attributed no additional value from this stock to decedent's gross estate. Likewise, the Tax Court did not include in decedent's gross estate a separate value attributable to decedent's lifetime transfers of partnership interests, which the Commissioner had

---

[10]The Tax Court found decedent's gross estate included securities totaling $1,232,076 transferred to the Turner Partnership, plus $257,015 in new partnership assets derived from those securities. The Tax Court therefore returned $1,489,091 to decedent's gross estate on account of assets transferred to the Turner Partnership. The court also returned $1,450,745 to decedent's estate for assets transferred to the Thompson Partnership. The Tax Court did not include in decedent's gross estate $221,850 in new, post-formation Thompson Partnership assets because it did not find these new assets were derived from decedent's contributed assets.

valued at $166,167. As a result of these adjustments, the Tax Court reduced the Commissioner's notice of deficiency from $3,335,177 to $2,939,836.[11]

The estate filed a timely notice of appeal.[12]

## III.

### A.

The Internal Revenue Code imposes a federal tax on "the taxable estate of every decedent who is a citizen or resident of the United States." 26 U.S.C. § 2001(a). A "taxable estate" is defined as "the value of the gross estate," less applicable deductions, *id.* § 2051, where the value of the "gross estate" includes "the value of all property to the extent of

---

[11]The Commissioner subsequently agreed the estate was entitled to a deduction of $474,195 for attorneys fees as an expense of estate administration, and a deduction of $184,674 for interest incurred and paid on the estate tax deficiency. The Tax Court entered a final deficiency for the reduced amount of $240,769.

[12]We have jurisdiction under 26 U.S.C. § 7482(a)(1). We exercise plenary review over the Tax Court's conclusions of law, including its construction and application of the Internal Revenue Code. *PNC Bancorp. v. Comm'r*, 212 F.3d 822, 827 (3d Cir. 2000). We review the Tax Court's factual findings for clear error. *Id.* Because the estate's executor resides in Pennsylvania, venue is proper under 26 U.S.C. § 7482(b)(1).

the interest therein of the decedent at the time of his death." *Id*. § 2033. In addition, § 2036 returns to decedent's gross estate any property transferred inter vivos over which the decedent retains enjoyment, possession or right to income during his lifetime. *See generally* Richard B. Stephens, *et al.*, *Federal Estate and Gift Taxation* ¶ 4.08 (8th ed. 2002). As noted, § 2036(a) provides, in part:

> **Transfers with retained life estate.** (a) General Rule. The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer (except in the case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, under which he has retained for his life or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death--
>
> > (1) the possession or enjoyment of, or the right to the income from, the property, or
> >
> > (2) the right, either alone or in conjunction with any person, to designate the persons who shall possess or enjoy the property or the income therefrom.

26 U.S.C. § 2036(a); *see also* 26 C.F.R. § 20.2036-1(a).

Section 2036 addresses the concern that inter vivos transfers often function as will substitutes, with the transferor continuing to enjoy the benefits of his property during life, and the beneficiary receiving the property only upon the transferor's death. *See United States v. Grace,* 395 U.S. 316, 320 (1969) ("[T]he general purpose of the statute was to include in a decedent's gross estate transfers that are essentially testamentary."). As such, § 2036(a)(1) returns property transferred inter vivos to the gross estate if the decedent retains possession, enjoyment, or the right to income from the property during his lifetime.[13] *Estate of D'Ambrosio v. Comm'r*, 101 F.3d 309, 312 (3d Cir. 1996) ("Section 2036(a) effectively discourages manipulative transfers of remainder interests which are really testamentary in

_____

[13]The statute also discourages situations where the decedent retains the right to determine who, other than himself, will possess or enjoy the transferred property. *See* 26 U.S.C. § 2036(a)(2). In its reply brief, the Commissioner argues in the alternative the transferred property should be included in the gross estate under § 2036(a)(2) because decedent retained the right to designate persons to possess or enjoy the property or income from the property. The parties did not raise this argument before the Tax Court. Because we affirm the Tax Court's decision with respect to § 2036(a)(1), we do not reach the question of whether § 2036(a)(2) applies in this case.

character by 'pulling back' the full, fee simple value of the transferred property into the gross estate."). Section 2036 provides an exception for any inter vivos transfer that is a "bona fide sale for an adequate and full consideration in money or money's worth." 26 U.S.C. § 2036(a).

**B.**

Section 2036(a)(1) returns an inter vivos transfer to decedent's gross estate if there is an express or implied agreement at the time of transfer that the transferor will retain lifetime possession or enjoyment of, or right to income from, the transferred property. 26 C.F.R. § 20.2036-1(a) ("An interest or right is treated as having been retained or reserved if at the time of transfer there was an understanding, express or implied, that the interest or right would later be conferred."); *see also Estate of McNichol v. Comm'r*, 265 F.2d 667, 671 (3d Cir. 1959). The existence of formal legal structures which prevent de jure retention of benefits of the transferred property does not preclude an implicit retention of such benefits. *Strangi*, 85 T.C.M. at 1338 ("[Although] the proverbial 'i's were dotted' and 't's were crossed'. . . [t]hey do not preclude implicit retention by decedent of economic benefit from the transferred property.") (internal citation omitted); *McNichol*, 265 F.2d at 673 ("Substance and not form is made the touchstone of taxability . . . [T]echnical concepts pertaining to the law of conveyancing cannot be used as a shield against the impact of death taxes when in fact possession of enjoyment of the property by the transferor . . . ceases only with his death."). An implied agreement may be inferred from the circumstances surrounding both the transfer and subsequent use of the property. *Estate of Reichardt v. Comm'r*, 114 T.C. 144, 151 (2000). Whether an implied agreement existed between decedent and his family at the time of the transfer is a question of fact, which we review for clear error. *See Estate of Maxwell v. Comm'r*, 3 F.3d 591, 594 (2d Cir. 1993).

After reviewing the record evidence, we see no clear error in the Tax Court's finding of an implied agreement between decedent and his family that decedent would "continue[] to be the principal economic beneficiary of the contributed property" and retain enjoyment of the transferred property sufficient to trigger § 2036(a)(1). *Thompson*, 84 T.C.M. at 387. Decedent transferred 95% of his assets to the family partnerships when he was ninety-five years old. As the Tax Court correctly found, decedent did not retain sufficient assets to support himself for the remainder of his life, as calculated at the time of transfer.[14] This fact supports the inference that decedent had "an implied understanding that his

---

[14] Decedent retained assets of $153,000 and had an annual income of $14,000. These assets were sufficient to cover decedent's fixed annual expenses of $57,202 for approximately three and half years. That is: $153,000/($57,202 - $14,000) = 3.54. Decedent had an actuarial life expectancy of 4.1 years at the time of transfer.

10

children would agree to his requests for money from the assets he contributed to the partnerships, and that they would do so for as long as he lived." *Id.* at 387. The record reflects Betsy and George Turner anticipated and prepared for this eventuality by seeking assurances from financial advisors that decedent would be able to withdraw assets from the partnerships to make cash gifts to the family.[15] Moreover, when decedent's remaining assets eventually ran low, Betsy Turner secured approval from the limited partnership to provide decedent with an "infusion" to cover his expenses.

Decedent's de jure lack of control over the transferred property does not defeat the inference of an implied agreement in these circumstances. *See McNichol*, 265 F.2d at 673 ("Substance and not form is made the touchstone of taxability."). The Tax Court recognized that although "some change ensued in the formal relationship of decedent to the

assets he contributed to the partnership, . . . [the] practical effect of these changes during decedent's life was minimal." *Thompson,* 84 T.C.M. at 387. Decedent could not formally withdraw funds from the partnerships without the permission of their respective corporate general partners, in each case, a corporation directed by Betsy Turner or Robert Thompson in which decedent held a 49% interest. But both Betsy Turner and Robert Thompson testified, and the estate concedes, they would not have refused decedent's request for such distributions. As such, it is clear from the operation of the partnerships during decedent's lifetime that "nothing beyond formal title changed in decedent's relationship to his assets." *Strangi*, 85 T.C.M. at 1339.[16] The fact that the other

---

[15]In a letter dated April 4, 2003, Betsy Turner asked a financial advisor whether decedent would be able to withdraw money from the Dean Witter securities account in order to make $10,000 gifts to his children, grandchildren and great-grandchildren. Likewise, in a letter dated November 28, 1993, George Turner wrote to a different financial advisor asking: "How does Betsy's father get $40,000 to give away as Christmas presents (with checks dated January 1994)? (Bob Thompson has a similar question.)." *Thompson*, 84 T.C.M. at 379.

---

[16]The estate argues the partnership distributions to decedent were accompanied by reductions in decedent's partnership interests, and were credited to his partnership capital accounts. The estate avers the distributions to decedent's partnership capital accounts (totaling $183,220) do not constitute "enjoyment" of the property, but merely involve a partial sale of decedent's partnership interests. Here again, "substance and not form" guides our analysis. Under these circumstances, the fact that decedent complied with the formalities of partnership distribution does not defeat an inference that he retained control over the assets after transfer. *See Strangi*, 85 T.C.M. at 1339 ("[A]ccounting entries alone are of small moment in belying the

partners similarly retained de facto control over assets contributed to the partnerships further supports this inference.[17] Where a decedent's relationship to the transferred assets remains the same both before and after transfer, § 2036(a)(1) returns those assets to the gross estate. *Guynn v. United States*, 437 F.2d 1148, 1150 (4th Cir. 1971).

Finally, the general testamentary character of the partnership arrangements supports the inference of an implied agreement. Decedent transferred the vast majority of his investment assets to two family limited partnerships when he was ninety-five years old. The record reveals, with one exception, that neither partnership engaged in business or loan transactions with anyone outside of the family.[18] Transferring this type and

volume of assets to family partnerships under these circumstances is more consistent with an estate plan than an investment in a legitimate business.

In sum, we see no clear error in the Tax Court's finding of an implied agreement at the time of transfer that decedent would retain enjoyment and economic benefit of the property transferred to the family limited partnerships, and that decedent, in fact, continued to be the principal economic beneficiary of the transferred property during his lifetime.[19]

---

existence of an agreement for retained possession and enjoyment.").

[17]For example, Betsy and Phoebe Turner each contributed partnership interests in a real estate partnership to the Turner Partnership, but retained title to the underlying real estate assets. Likewise, George Turner retained the right to income from timber produced on the Vermont property he contributed to the Turner Partnership.

[18]The exception is the Lewisville Properties purchased by the Turner Partnership. Apparently, this was a transaction between the Turner Partnership

and a third-party brokered by Phoebe Turner.

[19]The Commissioner argues § 2036(a)(1) applies for the additional reason that decedent expressly retained a "right to income" from the transferred property as a limited partner in the family partnerships. The estate contends decedent retained a legal right to income from the property only in his capacity as partner, and that this interest alone is insufficient to trigger § 2036(a)(1). We are not convinced decedent expressly retained a "right to income" from the transferred property. The cases relied upon by the Commissioner involved an explicit reservation of rights in the governing partnership or trust documents not present in this case. For example, in *Strangi v. Commissioner*, 85 T.C.M. (CCH) 1331, the Tax Court found decedent retained a right to income from a family limited partnership established, as

12

here, pursuant to the Fortress Plan. The partnership agreement in *Strangi* permitted distributions of partnership proceeds at the sole discretion of the managing corporate general partner. The corporate general partner appointed decedent's attorney-in-fact to manage the day-to-day operation of both the partnership and corporate general partner. As a result, the Tax Court found the "governing documents contain no restrictions that would preclude decedent himself, acting through [his attorney-in-fact], from being designated as a recipient of income from [the partnership]." *Id*. at 1337. Based on the language in the governing documents, the court concluded decedent retained a "right to income" from the partnership assets. *Id*.; *see also Estate of Pardee v. Comm'r*, 49 T.C. 140, 148 (1967) (finding a "right to income" within the meaning of § 2036(a)(1) where trust indenture expressly enabled decedent as trustee to pay out corpus and income for the "education, maintenance, medical expenses, or other needs of the Beneficiaries occasioned by emergency").

Here, by contrast, neither the partnership nor corporate documents expressly provide decedent a legal right to receive income distributions from the partnerships. Such distributions still required the approval of the corporate general partner, even though such approval was all but guaranteed as a practical matter. Nevertheless, we do not rely on this ground as a basis for applying § 2036(a)(1), given the Tax Court found that an implied agreement existed at the time of

## IV.

### A.

An inter vivos transfer with a retained lifetime interest will not be returned to the gross estate if the transfer constitutes a "bona fide sale for adequate and full consideration." 26 U.S.C. § 2036(a). The Tax Court concluded there were no transfers for consideration in this case because the transactions "were not motivated by . . . legitimate business concerns." *Thompson*, 84 T.C.M. at 388. It found none of the individual partners conducted an active business in the partnerships or pooled their assets with the assets contributed by the decedent. Each contributing partner directly received any income derived from the assets he or she contributed to the partnerships.[20] The partnerships held the securities transferred by the decedent without any substantial

transfer that decedent would retain the enjoyment and economic benefit of the transferred property, and that decedent continued to be the principal economic beneficiary of the transferred property during his lifetime.

[20]For example, by an undated amendment to the Turner Partnership agreement, retroactive to April 23, 1993, the partners allocated all gains and losses from, and distribution of real estate contributed to, the partnership to the contributing partner. Similarly, income from the sale of mules raised on the Norwood, Colorado ranch was paid directly to Robert Thompson.

13

change in investment strategy, and did not engage in business transactions with anyone outside of the family. As such, the Tax Court found the family limited partnerships served as "a vehicle for changing the form in which the decedent held his property—a mere 'recycling of value,'" and therefore concluded there was no transfer for consideration within the meaning of § 2036(a). *Id.*

The Tax Court first announced the "recycling" of value concept in *Estate of Harper v. Commissioner,* T.C. Memo 2002-121; 2002 Tax Ct. Memo LEXIS 127; 83 T.C.M. (CCH) 1641 (2002). In *Harper*, the Tax Court denied the bona fide sale exception to an inter vivos transfer where:

> [A]ll decedent did was change the form in which he held his beneficial interest in the contributed property . . . . Essentially, the value of the partnership interest the Trust received derived solely from the assets the Trust had just contributed. Without any change whatsoever in the underlying pool of assets or prospect for profit . . . there exists nothing but a circuitous "recycling" of value. We are satisfied that such instances of pure recycling do not rise to the level of a payment of consideration. To hold otherwise would open

section 2036 to a myriad of abuses engendered by unilateral paper transformations.

*Id.* at 1653. The Tax Court concluded that where a "transaction involves only the genre of value 'recycling' . . . and does not appear to be motivated primarily by legitimate business concerns, no transfer within the meaning of section 2036(a) has taken place." *Id*. at 1654.

More recently, the Tax Court affirmed this reasoning in *Strangi v. Commissioner*, 85 T.C.M. (CCH) 1331 (2003). Similar to the facts at issue here, *Strangi* involved an inter vivos transfer of assets to a family limited partnership as part of a Fortress estate plan. Decedent transferred 98% of his total assets, including his residence, to a family limited partnership. From the time of its funding until decedent's death, the Strangi family limited partnership engaged in no business operations or commercial transactions. The only economic activity conducted by the partnership involved paying for decedent's health and nursing expenses, funeral and estate tax costs. As such, the Tax Court concluded decedent's inter vivos transfers to the family limited partnership were not transfers for consideration within the meaning of § 2036(a):

> We see no distinction of consequence between the scenario analyzed in *Estate of Harper v. Commissioner, supra*, and that of the

present case. Decedent contributed more than 99 percent of the total property placed in the [family limited partnership] and received back an interest the value of which derived almost exclusively from the assets he had just assigned. Furthermore, the [family limited partnership] patently fails to qualify as the sort of functioning business enterprise that could potentially inject intangibles that would lift the situation beyond mere recycling.

*Strangi*, 85 T.C.M. at 1344.

For essentially the same reasons, we conclude there was no transfer for consideration within the meaning of § 2036(a). The record demonstrates that neither the Turner Partnership nor the Thompson Partnership engaged in any valid, functioning business enterprise. As the estate concedes "the primary objective of the partners in forming the Partnerships was not to engage in or acquire active trades or business." Although the partnerships did conduct some economic activity, these transactions did not rise to the level of legitimate business operations.

In the case of the Thompson Partnership, the only "active operations" claimed by the estate involved leasing the Norwood, Colorado ranch back to its contributing partner and former resident, Robert Thompson, for an annual fee of $12,000. The Norwood ranch was not otherwise operated as an income producing business, either before or after Robert Thompson contributed the property to the partnership. Robert Thompson apparently generated some income from the sale of mules raised on the property, but income from these sales went to Robert directly and not to the partnership. Nevertheless, the Thompson Partnership paid an annual "management fee" ranging between $23,625 and $47,500 to the Thompson Corporation, which in turn paid Robert Thompson an annual salary of $32,001. We see no error in the Tax Court's finding this putative business arrangement amounted to no more than a contrivance, and did not constitute the type of legitimate business operations that might provide a substantive non-tax benefit for transferring assets to the Thompson Partnership.

The operations of the Turner Partnership were more extensive, but still fail to provide sufficient objective indicia of a legitimate business operation. Although the Turner Partnership made numerous loans to Betsy Turner's children and grandchildren, this lending activity appears largely testamentary in practice. Loans were not made to anyone outside the extended Turner family, interest payments were often late or never paid, and the partnership took no enforcement action against delinquent debtors. We agree with the Tax Court that these lending activities "lacked any semblance of business transactions," and were "testamentary in nature, using decedent's

15

money as a source of financing for the needs of individual family members, not for business purposes." *Thompson*, 84 T.C.M. at 388. Furthermore, the partners amended the Turner Partnership agreement, retroactive to April 23, 1993, to allocate all gains and losses from, and distribution of real estate contributed to the partnership, to the individual contributing partner. Aside from decedent's securities, the Turner Partnership consisted primarily of real estate assets. Directing all income derived from the partnership's real estate assets to the contributing partner—including any appreciation realized in the sale of such assets[21]—denied decedent any non-tax benefit potentially derived from the assets collected in the partnership.

The Turner Partnership's $186,000 investment in the Lewisville Properties gives us some pause, but ultimately does not alter our conclusion. Unlike the other activities of the Turner and Thompson Partnerships, this investment seems to qualify as a legitimate business transaction with a third-party.[22] However, based on the record evidence in this case, we conclude that any legitimizing effect of the Turner Partnership's investment in the Lewisville Properties is overwhelmed by the testamentary nature of the transfer and subsequent operation of the partnership.

In addition to the lack of legitimate business operations, the form of the transferred assets—predominately marketable securities—is significant to our assessment of the potential non-tax benefits available to decedent as a result of the transfer. Other than favorable estate tax treatment resulting from the change in form, it is difficult to see what benefit could be derived from holding an untraded portfolio of securities in this family limited partnership with no ongoing business operations. *Compare Church v. United States*, No. SA-97-CA-0774-OG, 2000 U.S. Dist. LEXIS 714 (W.D. Tex. Jan 18, 2000), *aff'd without published opinion*, 268 F.3d 1063 (5th Cir. 2001) (applying § 2036(a) exception to assets transferred to a limited partnership that consolidated undivided ownership interests and administration of a family ranching business); *Estate of Stone v. Comm'r*, T.C. Memo 2003-309; 2003 Tax Ct. Memo LEXIS 312; 86 T.C.M. (CCH) 551 (2003) (applying § 2036(a) exception to assets transferred to family partnerships operated

---

[21]This is evident in the sale of the Woodlands Property. When Betsy and George Turner sold the 22-acre Woodlands Property parcel along with their Woodside Farm residence, they allocated to the Turner Partnership an amount of the Woodside Farm/Woodland Property sale proceeds exactly equal to the Turner Partnership's basis in the Woodlands Property. This effectively eliminated any gain or loss in the sale price.

[22]With respect to the Turner Partnership therefore, the Tax Court erred in finding the "partnerships did not engage in transactions with anyone outside the family." *Thompson*, 84 T.C.M. at 388.

as going concern businesses in order to transfer management of businesses to children); *Kimbell v. United States*, 371 F.3d 257, 267-68 (5th Cir. 2004) (applying § 2036(a) exception to working oil and gas interests transferred to a family partnership to provide, among other things, centralized management and protection from personal environmental liabilities). The form of assets transferred supports our conclusion there was no transfer for consideration within the meaning of § 2036(a).

The estate claims decedent's transfer of liquid, marketable securities and other assets to the family limited partnerships reduced the value of those assets by 40% because of the resulting lack of control and marketability. Indeed, as the Tax Court found, decedent's financial advisors presented this reduction in value for estate tax purposes as one of the primary advantages of using the Fortress Plan. In one sense, claiming an estate tax discount on assets received in exchange for an inter vivos transfer should defeat the § 2036(a) exception outright. If assets are transferred inter vivos in exchange for other assets of lesser value, it seems reasonable to conclude there is no transfer for "adequate and full consideration" because the decedent has not replenished the estate with other assets of equal value. *See Wheeler v. United States*, 116 F.3d 749, 762 (5th Cir. 1997) ("[U]nless a transfer that depletes the transferor's estate is joined with a transfer that augments the estate by a commensurate (monetary) amount, there is no 'adequate and full

consideration' for the purposes of either the estate or gift tax.").

That said, the Tax Court has held that the dissipation of value resulting from the transfer of marketable assets to a closely-held entity will not automatically constitute inadequate consideration for purposes of § 2036(a). *See Harper*, 83 T.C.M. at 1654 (noting partnership interests may constitute "adequate and full consideration" if there is also a "potential [for] intangibles stemming from pooling for joint enterprise"); *Stone*, 86 T.C.M. at 581 (concluding the lack of marketability discount applied to limited partnership interests does not, on its own, result in inadequate consideration for purposes of § 2036).

Nonetheless, we believe this sort of dissipation of value in the estate tax context should trigger heightened scrutiny into the actual substance of the transaction. Where, as here, the transferee partnership does not operate a legitimate business, and the record demonstrates the valuation discount provides the sole benefit for converting liquid, marketable assets into illiquid partnership interests, there is no transfer for consideration within the meaning of § 2036(a).

**B.**

We also conclude decedent's transfers to the family limited partnership do not constitute "bona fide sales" within the meaning of § 2036(a), although for somewhat different reasons than the Commissioner suggests. The Commissioner argues there was no "bona

fide sale" in this case because decedent "stood on both sides of the transaction" as transferor and a limited partner of the family partnerships. The Commissioner's position is supported by several cases which have concluded that a "bona fide sale" requires an arm's length bargain. *See, e.g.*, *Bank of New York v. United States,* 526 F.2d 1012, 1016 (3d Cir. 1975) ("[T]he value of the claim settled by the estate may not be deducted if the agreement on which the claim was based was not bargained at arm's length."); *Harper*, 83 T.C.M. at 1653 (denying the § 2036 exception, in part, where there was no "arm's length bargaining" because decedent "stood on both sides of the transaction"); *Strangi*, 85 T.C.M. at 1343 (finding no bona fide sale where "decedent essentially stood on both sides of the transaction"). As a practical matter, an "arm's length" transaction provides good evidence of a "bona fide sale," especially with intra-family transactions. But some courts have also found a bargained-for exchange in the family context when the interests of individual family members were sufficiently divergent. *See, e.g., Bank of New York*, 526 F.2d at 1017 ("Even a family agreement, although achieved without apparent bitterness, has been regarded as bargained for when members of the family had interests contrary to those of other family members."); *Stone*, 86 T.C.M. at 579 (finding an arm's length bargain in intra-family transaction where each family member retained independent counsel).

That said, however, neither the Internal Revenue Code nor the governing Treasury Regulations define "bona fide sale" to include an "arm's length transaction." Treasury Regulation 20.2036-1(a) defines "bona fide sale for an adequate and full consideration" as a transfer made "in good faith" and for a price that is "adequate and full equivalent reducible to a money value." 26 C.F.R. § 20.2036-1(a) (referring to 26 C.F.R. § 20.2043-1(a)). Based in part on an interpretation of this regulation, the Court of Appeals for the Fifth Circuit concluded a "bona fide sale" only requires "a sale in which the decedent/transferor actually parted with her interest in the assets transferred and the partnership/transferee actually parted with the partnership interest issued in exchange." *See Kimbell*, 371 F.3d at 265. The court reasoned:

> [J]ust because a transaction takes place between family members does not impose an additional requirement not set forth in the statute to establish that it is bona fide. A transaction that is a bona fide sale between strangers must also be bona fide between members of the same family. In addition, the absence of negotiations between family members over price or terms is not a compelling factor in the determination . . . particularly when the

18

exchange value is set by objective factors.

*Id.* at 263 (discussing *Wheeler*, 116 F.3d 749) (internal citations omitted).

We similarly believe a "bona fide sale" does not necessarily require an "arm's length transaction" between the transferor and an unrelated third-party. Of course, evidence of an "arm's length transaction" or "bargained-for exchange" is highly probative to the § 2036 inquiry. But we see no statutory basis for adopting an interpretation of "bona fide sale" that would automatically defeat the § 2036 exception for all intra-family transfers. *Wheeler*, 116 F.3d at 766 ("Unless and until the Congress declares that intrafamily transfers are to be treated differently . . . we must rely on the objective criteria set forth in the statute and Treasury Regulations to determine whether a sale comes within the ambit of the exception to section 2036(a).").

We are mindful of the mischief that may arise in the family estate planning context. As the Supreme Court observed, "the family relationship often makes it possible for one to shift tax incidence by surface changes of ownership without disturbing in the least his dominion and control over the subject of the gift or the purposes for which the income from the property is used." *Comm'r v. Culbertson*, 337 U.S. 733, 746 (1949). But such mischief can be adequately monitored by heightened scrutiny of intra-family transfers, and does not require a uniform prohibition on transfers to family limited partnerships. *See id.* ("[The] existence of the family relationship does not create a status which itself determines tax questions, but is simply a warning that things may not be what they seem."); *Kimbell*, 371 F.3d at 265 ("[W]hen the transaction is between family members, it is subject to heightened scrutiny.").

Moreover, the facts here are distinguishable from those Tax Court cases which have denied the "bona fide sale" exception after finding decedent "stood on both sides of the transaction." For example, in *Harper*, the Tax Court was "unable to find any other independent party involved in the creation" of the family partnerships. 83 T.C.M. at 1653. The Tax Court found that "[d]ecedent, independently of any other anticipated interest-holder, determined how the [partnership] was to be structured and operated, decided what property would be contributed to capitalize the entity, and declared what interest the Trust would receive therein." *Id.* Likewise in *Strangi*, decedent's attorney-in-fact prepared the family partnership structure, including the assets contributed, without any participation from the contributing family members. 85 T.C.M. at 1344. In both cases, the decedent contributed over 99% of the total partnership assets. *See id.*; *Harper*, 83 T.C.M. at 1653. Here, by contrast, both the formation and funding of the Turner and Thompson Partnerships involved substantial participation by decedent's family members and their respective spouses.

19

However, while a "bona fide sale" does not necessarily require an "arm's length transaction," it still must be made in good faith. *See* 26 C.F.R. § 20.2043-1(a). A "good faith" transfer to a family limited partnership must provide the transferor some potential for benefit other than the potential estate tax advantages that might result from holding assets in the partnership form. Even when all the "i's are dotted and t's are crossed," a transaction motivated solely by tax planning and with "no business or corporate purpose . . . is nothing more than a contrivance." *Gregory v. Helvring*, 293 U.S. 465, 469 (1935). "To hold otherwise would be to exalt artifice above reality and to deprive the statutory provision in question of all serious purpose." *Id.* As discussed in the context of "adequate and full consideration," objective indicia that the partnership operates a legitimate business may provide a sufficient factual basis for finding a good faith transfer. But if there is no discernable purpose or benefit for the transfer other than estate tax savings, the sale is not "bona fide" within the meaning of § 2036. *See, e.g.*, *id.* (ignoring a transaction for estate tax purposes after finding "no business or corporate purpose" for the transaction); *compare Kimbell*, 371 F.3d at 267 (finding a "bona fide sale" where the transaction was entered into for "substantial business and other non-tax reasons").

After a thorough review of the record, we agree with the Tax Court that decedent's inter vivos transfers do not qualify for the § 2036(a) exception because neither the Thompson Partnership nor Turner Partnership conducted any legitimate business operations, nor provided decedent with any potential non-tax benefit from the transfers.

## V.

For the foregoing reasons, we will affirm the decision of the Tax Court.

20

Turner v. Commissioner of Internal Revenue, No. 03-3173

GREENBERG, Circuit Judge, concurring.

I join in Chief Judge Scirica's opinion in this case without reservation but want to add a few thoughts with respect to the issue of whether we are dealing with transfers for "adequate and full consideration in money or money's worth." Preliminarily on this point I think that Chief Judge Scirica gets to the heart of the matter by noting that "[i]n one sense, claiming an estate tax discount on assets received in exchange for an inter vivos transfer should defeat the § 2036(a) exception outright [for] [i]f assets are transferred inter vivos in exchange for other assets of lesser value, it seems reasonable to conclude that there is no transfer for 'adequate and full consideration' because the decedent has not replenished the estate with other assets of equal value." Maj. opinion at 17.

This conclusion is consistent with Estate of D'Ambrosio v. Commissioner, 101 F.3d 309, 312 (3d Cir. 1996) (quoting Estate of Frothingham v. Commissioner, 60 T.C. 211, 215 (1973)), in which we indicated that a transfer is for adequate and full consideration when "the transferred property is replaced by other property of equal value received in exchange." Our conclusion in D'Ambrosio was

unassailable inasmuch as section 2036(a) sets the standard for "adequate and full consideration" in the unmistakable term of "money or money's worth" and thus does not permit the use of intangible nonmonetary considerations in determining value. Therefore, a transfer of $1,000,000 in assets will be for an adequate and full consideration if it is for $1,000,000 in money. If a transfer is for property then the "money's worth" of the property should be of the same value as money received for the transferred property would have had to have been, i.e., $1,000,000.[23]

In this case, inasmuch as the transfers were not for money the exception can apply only if the transfers were for property that can be regarded as being for "money's worth." Yet one of the motivations for the transfers was that there would be a substantial discount, claimed by the estate to be 40%, when the assets transferred instead of being valued directly were valued indirectly as the direct valuation for estate tax purposes was of the estate's interests in the partnerships and corporations holding the assets. To me nothing could be clearer than a conclusion that if the discount was justified (even if in a lesser percentage than the estate claimed) in a valuation sense then the decedent could not have received an adequate and full consideration for his transfers in terms of

---

[23]I do not suggest that absolute parity is required.

"money's worth." Thus, I think it clear that the Fortress Plan as applied in a case in which the decedent retained for his life the enjoyment from the transferred property should be completely ineffective to create a tax benefit by reducing the value of the decedent's estate as the transferred property must be recaptured by the estate for estate tax purposes. Accordingly, in joining in Chief Judge Scirica's opinion I agree with it on the consideration issue.

I, however, wish to make three additional points. The first point relates to the estate's vigorous argument, which Chief Judge Scirica does not address, that the decedent did not make a gift for gift tax purposes upon the formation of the partnerships and therefore there must have been an adequate and full consideration for his transfers. The estate explains its argument as follows:

> Here, the IRS has not contended nor did the Tax Court find that there was a gift on formation of the Partnerships and no such gift was made. No gratuitous transfer occurred upon the formation of the Partnerships because each participant's interest in the Partnerships was proportional to the capital contributed. The partners received a pro-rata interest in each Partnership equal to their pro-rata contribution.

> [The decedent's] contribution did not enhance any other partner's interests. None of the partners received any property from [the decedent] directly or indirectly when the Partnerships were formed. Therefore, no gratuitous transfer occurred upon the formation of the Partnerships and section 2036(a)(1) is inapplicable.

Appellant's br. at 24 (footnote omitted). The estate's predicate for the argument is that the gift tax and estate tax are in pari materia so that a transfer made for an adequate and full consideration for gift tax purposes also is made for an adequate and full consideration under section 2036(a). The Commissioner answers that "[t]here were no gifts on formation [of the partnerships] not because there was full consideration, but because there were no gifts at all. Decedent's retention of control over the assets is inconsistent with a donative transfer." Appellee's br. at 47 n.12.

The Commissioner is not being inconsistent in contending that there was not an adequate and full consideration for the transfers under section 2036(a) while acknowledging that the decedent did not make taxable gifts upon the creation of the partnerships. Even if the estate's claim that the discount is justified would be well founded were it not for section 2036(a), that assumption does not mean that the

value decedent lost upon the creation of the partnerships went to someone else. Rather, the recycling of the assets so that they were valued indirectly rather than directly simply caused them to lose value. Therefore, precisely as the Commissioner contends, there were no gifts at all when the partnerships were formed. Indeed, as the estate's brief plainly reveals, the estate, perhaps not recognizing the significance of its concession, acknowledges that none of the partners received any property from the decedent "directly or indirectly" when the partnerships were formed. Thus, there were no gifts and the estate's observation that the gift tax and estate tax are in pari materia is immaterial as this relationship does not change the fact that the decedent enjoyed the property he transferred until his death and did not receive adequate and full consideration for it in money's worth.

The second point I make is that the logic of the court in this case should not be applied too broadly and I see no reason why it will be. In this regard I acknowledge that there surely are numerous partnerships in which a partner dies after contributing assets to the partnership and therefore has made a transfer that arguably could be said to be within section 2036(a). Certainly the court is not holding that in all such circumstances section 2036(a) could be applicable requiring that the valuation of the decedent's interest at death be made by looking through his interest in the partnership directly to its assets, thus disregarding the partnership's existence for purposes of estate tax valuation.

Here, however, we have a narrow situation in which the partnerships were created in furtherance of what the estate calls an "estate plan" with "[t]he primary purposes . . . to provide a vehicle for gift giving, to preserve assets and ultimately to transfer the partnership interests . . . in an orderly and efficient fashion." Appellant's br. at 5. In addition, as the Tax Court pointed out, the parties intended that implementation of the plan save taxes by lowering the taxable value of the estate. Furthermore, as the estate acknowledges, "the primary objective of the partners in forming the Partnerships was not to engage in or acquire active trades and businesses, [though] the Partnerships were involved in various investments and activities." Id. at 29. In fact, the Commissioner emphasizes that the "estate concedes that the partnerships never intended to carry on any sort of active trade or business," and he points out that "the partnerships [did not] carry on any sort of common investment activity of any significance." Appellee's br. at 45-46. It therefore appears that the Commissioner implicitly recognizes that there are limitations on his argument.

I make this second point as I do not want it thought that the court's reasoning here should be applied in routine commercial circumstances and in this regard I note that Chief Judge Scirica observes that the partnerships do not operate legitimate businesses. Accordingly, I believe that the court's opinion here should not discourage transfers in ordinary commercial

23

transactions, even within families. Cf. Estate of Strangi, 115 T.C. 478, 484 (2000) ("Family partnerships have long been recognized where there is a bona fide business carried on after the partnership is formed."), aff'd in part, rev'd in part on other grounds, 293 F.3d 279 (5th Cir. 2002). Rather, we are addressing a situation in which the family partnerships obviously were used as tax dodges in circumstances that section 2036(a) was intended to thwart. Therefore, the result the court reaches on the adequate and full consideration issue readily accommodates the estate's observation that "[a]n interest received in a closely held business entity typically has a value less than a pro rata part of the contributed assets for reasons relating to lack of marketability, minority interest and the like." Appellant's reply br. at 14.

This second point is important because courts should not apply section 2036(a) in a way that will impede the socially important goal of encouraging accumulation of capital for commercial enterprises. Therefore in an ordinary commercial context there should not be a recapture under section 2036(a) and thus the value of the estate's interest in the entity, though less than the value of a pro rata portion of the entity's assets, will be determinative for estate tax purposes. This case simply does not come within that category.

My third point relates to Estate of Stone v. Commissioner, 86 T.C.M. (CCH) 551, 581 (2003), in which, in language

similar to that of the estate that I quoted above, the court indicated:

[The Commissioner] nonetheless argues that, because Mr. Stone and Ms. Stone received respective partnership interests in each of the Five Partnerships the value of which, taking into account appropriate discounts, was less than the value of the respective assets that they transferred to each such partnership, they did not receive adequate and full consideration for the assets transferred. [The Commissioner's] argument in effect reads out of section 2036(a) the exception for 'a bona fide sale for an adequate and full consideration in money or money's worth' in any case where there is a bona fide, arm's-length transfer of property to a business entity (e.g., a partnership or a corporation) for which the transferor receives an interest in such entity (e.g., a partnership interest or stock) that is proportionate to the fair market value of the property transferred to such entity and the determination of the value of such an interest takes into account

24

appropriate discounts. We reject such an argument by [the Commissioner] that reads out of section 2036(a) the exception that Congress expressly prescribed when it enacted that statute.

The Commissioner correctly recognizes that Stone is inconsistent with his position here and the estate understandably relies on Stone. I reject Stone on the quoted point as the Commissioner's position in no way reads the exception out of section 2036(a) and the Tax Court does not explain why it does.[24] Rather, the

adequate and full consideration under § 2036(a). This conflation misses the mark: The business decision to exchange cash or other assets for a transfer-restricted, non-managerial interest in a limited partnership involves financial considerations other than the purchaser's ability to turn right around and sell the newly acquired limited partnership interest for 100 cents on the dollar. Investors who acquire such interests do so with the expectation of realizing benefits such as management expertise, security and preservation of assets, capital appreciation and avoidance of personal liability. Thus there is nothing inconsistent in acknowledging, on the one hand, that the investor's dollars have acquired a limited partnership interest at arm's length for adequate and full consideration and, on the other hand, that the asset thus acquired has a present fair market value, i.e., immediate sale potential, of substantially less than the dollars just

---

[24]In Kimbell v. United States, 371 F.3d 257, 265-66 (5th Cir. 2004), the court quoted the above language from Stone with approval and went on to point out that:

> We would only add to the Tax Court's rejection of the government's inconsistency argument that it is a classic mixing of apples and oranges: The government is attempting to equate the venerable 'willing buyer-willing seller' test of fair market value (which applies when calculating gift or estate tax) with the proper test for

Commissioner seeks to apply the exception precisely as written as his position should not be applied in ordinary commercial circumstances even though the decedent may be said to have enjoyed the property until his death.

Judge Rosenn joins in this concurring opinion.

---

paid--a classic informed trade-off.

I believe, however, that Kimbell does not take into account that to avoid the recapture provision of section 2036(a) the property transferred must be "replaced by property of equal value that could be exposed to inclusion in the decedent's gross estate" D'Ambrosio, 101 F.3d at 313 (quoting Frothingham, 60 T.C. at 216 (omitting emphasis)), on a "money or money's worth" basis.